**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01461-WJM

THE STATE OF COLORADO,

      Plaintiff,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental
Protection Agency;
U.S. ARMY CORPS OF ENGINEERS; and
R.D. JAMES, in his official capacity as Assistant Secretary of the Army for Civil Works,

      Defendants.

---

**AMENDED MOTION FOR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

The new definition of "Waters of the United States" (the "2020 Rule") will dramatically reduce federal Clean Water Act jurisdiction over Colorado waterbodies starting on June 22, 2020. This sudden reduction will cause irreparable harm to Colorado by leaving all of Colorado's ephemeral streams and a significant number of its intermittent streams and wetlands without federal regulatory protection, creating two distinct harms. First, it removes federal permitting and enforcement mechanisms from these waters, jeopardizing their quality. Second, because there is no state program to fill its place, common conduct requiring federal permits, such as development and infrastructure projects, must cease in Colorado until the State develops the regulatory structure to review such permit requests. By contrast, there is no compelling reason that implementation of the 2020 Rule must begin on June 22.

Colorado is likely to succeed on the merits of its claims. Specifically, the 2020 Rule is inconsistent with the text and purpose of the Clean Water Act, is entirely at odds with the applicable legal standard for determining the scope of the Act's jurisdiction over ephemeral and intermittent streams and wetlands, fails to adequately consider economic impacts on the State, and ignores relevant and clearly established scientific evidence previously relied on by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers (the "Corps") (the "Agencies") without sufficient explanation. In addition, the Corps failed to conduct the required environmental review of the 2020 Rule. Colorado therefore moves to enjoin the Defendants from implementing this rule under Rule 65(a).

## D.C.COLO.LCivR 7.1 CERTIFICATION

Plaintiff State of Colorado certifies that it conferred with counsel for Defendants about

this motion, and Defendants oppose the motion.

## BACKGROUND

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act creates a uniform "national floor" of pollution protections by establishing minimum pollution controls for "waters of the United States." *See Ark. v. Okla.*, 503 U.S. 91, 110 (1992). The Act's central requirement is that pollutants, including dredged and fill materials, may not be discharged from a point source into "navigable waters," defined as "waters of the United States, including the territorial seas," without a permit. *See* 33 U.S.C. §§ 1311(a), 1342(a), 1344(a), 1362(7), 1362(12). Because the Act does not define "waters of the United States," it is left to the Agencies to supply a definition consistent with the scope and purpose of the Act.

The Agencies have defined the term "waters of the United States" through guidance and rulemaking. Rules issued in 1977 and the 1980s defined the term to cover: (1) waters used or susceptible of use in interstate and foreign commerce, commonly referred to as navigable-in-fact or "traditionally navigable" waters; (2) interstate waters; (3) the territorial seas; and (4) other waters having a nexus with interstate commerce. *See* 42 Fed. Reg. 37,122 (July 19, 1977); 45 Fed. Reg. 85,336 (Dec. 24, 1980); 47 Fed. Reg. 31,794 (July 22, 1982); 51 Fed. Reg. 41,206 (Nov. 13, 1986); 53 Fed. Reg. 20,764 (June 6, 1988).

Several Supreme Court opinions have examined the meaning of "waters of the United States." The Clean Water Act establishes "broad federal authority to control pollution" in order to protect water quality, and "Congress chose to define the waters covered by the Act broadly." *U.S. v. Riverside Bayview Homes*, 474 U.S. 121, 133 (1985). In addition, Congress' concern for

the protection of water quality and aquatic ecosystems indicates an intent to confer Clean Water Act jurisdiction over wetlands with a significant nexus to "navigable waters." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001) ("SWANCC"). In *U.S. v. Rapanos*, the Court issued five separate opinions concerning the Corps' interpretation of "waters of the United States," none of which secured a majority. However, five justices agreed that water features that impact the quality of "navigable" waters are within the jurisdictional reach of the Act. 547 U.S. 715, 779-80 (Kennedy, J., concurring) & 793-94 (Stevens, J. et al., dissenting) (2006). In his concurring opinion, Justice Kennedy adopted a water quality-based definition of "waters of the United States," holding that wetlands fall within the scope of the Act if, either alone or in combination with "similarly situated lands in the region," they have a "significant nexus" to traditional navigable waters. 547 U.S. at 776, 779. Since *Rapanos*, the Agencies have recognized that the "significant nexus" standard is controlling and have consistently included a significant nexus analysis in making jurisdictional determinations. *See Clean Water Act Jurisdiction Following the Supreme Court Decision in Rapanos v. United States and Carabell v. United States* (Dec. 2, 2008) ("2008 Guidance"), attached as Exhibit 1.

In 2015, the Agencies issued a final rule again defining "waters of the United States" and adopting the "significant nexus" standard. *See* 80 Fed. Reg. 37,054, 37,057 (Jun. 29, 2015) ("2015 Rule"); *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report)*, EPA, EPA/600/R-14/475F (Jan. 2015) (the "Connectivity Report") attached as Exhibit 2. The 2015 Rule defined "significant nexus" to mean "a water, including wetlands, that either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity"

of jurisdictional by rule waters. 80 Fed. Reg. at 37,106.

In 2017, the President directed the Agencies to review the 2015 Rule and issue new rules rescinding or revising their interpretation of "navigable waters" and "waters of the United States" to be consistent with Justice Scalia's plurality opinion in *Rapanos*. Exec. Order No. 13778, 82 Fed. Reg. 12497 (Mar. 3, 2017). The Agencies repealed the 2015 Rule in 2019. On February 14, 2019, the Agencies published the proposed replacement rule. Colorado submitted comments on the proposed rule raising a number of objections to and questions about the proposed rule and describing the proposed rule's specific economic and environmental impacts to Colorado. *See* Colorado Comment Letter (Apr. 15, 2019), attached as Exhibit 3.

Ultimately, the Agencies promulgated a rule that articulates a significantly narrower definition of "waters of the United States" than any prior definition in the history of the Clean Water Act. The 2020 Rule excludes from the definition of "waters of the United States," among other things, ephemeral features, including ephemeral streams, swales, gullies, rills, and pools. 33 C.F.R. § 328.3(b); 40 C.F.R. § 120.2(2).

The rule also includes several definitions that further limit how the Agencies will define "waters of the United States.". First, it restricts the definition of protected "adjacent wetlands" to those that "abut" or have a direct hydrological surface connection to another jurisdictional water "in a typical year." 33 C.F.R. § 328.3(c)(1); 40 C.F.R. § 120.3(3)(i). The 2020 Rule also limits protections for tributaries to those that contribute perennial or uncertain levels of "intermittent" flow to a traditional navigable water in a "typical year," 33 C.F.R. § 328.3(c)(12); 40 C.F.R. § 120.2(3)(xii), a term whose definition leads to additional uncertainty, *see* 33 C.F.R. § 328.3(c)(13); 40 C.F.R. § 120.2(3)(xiii).

Collectively, these new definitions in the 2020 Rule reduce the scope of waters subject to federal jurisdiction in Colorado far below that of the 2008 Guidance and protect the least number of waters since the passage of the Act in 1972. Ephemeral and intermittent waters account for at least 68 percent of Colorado's stream miles. All of Colorado's ephemeral streams will be categorically excluded from federal Clean Water Act protection, and it is uncertain how many of Colorado's intermittent streams will be covered. Declaration of Patrick Bachmann (Bachmann Decl.) ¶¶ 4, 21. In addition, a significant percentage of Colorado's wetlands will likely be newly excluded from federal jurisdiction. Declaration of Trevor Klein (Klein Decl.) ¶¶ 12, 13.

## ARGUMENT

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can resolve the plaintiff's claims. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986). A preliminary injunction is warranted here because halting implementation of the 2020 Rule will ensure that the current regulatory definitions and 2008 implementing guidance remain in effect in Colorado, preserving the relative position of the parties until the merits of the case are resolved. In addition, an injunction is in the public interest of protecting the integrity of Colorado's waters without causing any injury to the Agencies, which have been implementing the current definition of "waters of the United States" for decades and have well-established policies and guidance for making jurisdictional determinations under the current rule.

Colorado has established all four factors required for a preliminary injunction: (1) the movant is likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing

party will suffer under the injunction; and (4) the injunction would not be adverse to the public

interest. *Fish v. Kobach,* 840 F.3d 710, 723 (10th Cir. 2016).

I. **Colorado will suffer irreparable harm if the rule is implemented**

"What makes an injury 'irreparable' is the inadequacy of, and the difficulty of

calculating, a monetary remedy after a full trial." *Free the Nipple-Fort Collins v. City of Fort*

*Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) (internal citation omitted). If an injunction

does not issue here, Colorado will suffer significant harm to both its environment and its

economy, neither of which can be adequately compensated, and which entitle it to preliminary

relief. Harm to the environment "by its nature, can seldom be adequately remedied by money

damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co.*

*v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987). Economic harm that cannot be recovered

is also considered irreparable. *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab.*

*Servs*., 31 F.3d 1536, 1543 (10th Cir. 1994); *Cloud Peak Energy Inc. v. United States*

*Department of Interior*, 415 F.Supp.3d 1034, 1040-43 (D. Wyo. 2019).

A. **The 2020 Rule's substantial narrowing of federal jurisdiction will create a permitting gap and halt important projects in the State.**

Colorado defines its "state waters" more broadly than "waters of the United States;" state

waters are "any and all surface and subsurface waters which are contained in or flow in or

through this state," with minor exceptions for waters in treatment systems. *See* COLO. REV. STAT.

§ 25-8-103(19). Colorado bars discharges of pollutants to state waters without a permit. *See*

COLO. REV. STAT. § 25-8-501(1). The Water Quality Control Division ("Division") of the

Colorado Department of Public Health and Environment administers a point source discharge

permitting program, as delegated by EPA under Section 402 of the Clean Water Act. Under this

framework, the Division may only issue permits for discharges of pollutants if such discharges comply with State water quality standards and do not compromise the water body's classified uses. Declaration of Nicole Rowan (Rowan Decl.) ¶ 9; COLO. REV. STAT. § 25-8-503(4). Because discharges of large quantities of fill, by their nature, are likely to result in exceedances of state water quality standards and compromise the classified uses of these waters, the Division could not allow almost any of them under a state discharge permit. Rowan Decl. ¶ 10. Without a permit, these discharges would be illegal. *Id*.

The Corps administers a Section 404 permitting program to authorize dredge and fill projects that result in discharges to waters under federal jurisdiction. Colorado has not assumed authority for permitting under Section 404 and instead relies on the Corps' extensive permitting program to authorize a wide range of projects involving dredge and fill operations and protect critical streams and wetlands through appropriate permit conditions. Rowan Decl. ¶ 6. Permit applicants must show that they have taken steps to avoid impacts to aquatic ecosystems; minimize potential impacts; and provide compensatory mitigation for all remaining unavoidable impacts. *See* 40 C.F.R. §§ 230.10(a) and (d), 230.70-77, 230.91-98. Under the 2020 Rule, all ephemeral waters, some previously jurisdictional intermittent waters, and many of Colorado's wetlands will be excluded from federal jurisdiction, and thus will become ineligible for the Corps' Section 404 fill permits. Because there is no parallel state permitting system for these discharges of fill to state waters, project sponsors will be left without any legal mechanism to authorize projects that require discharges of fill in these waters. The narrowed definition of waterbodies subject to federal Clean Water Act jurisdiction thus creates a "gap" where certain development and infrastructure activities will not be able to legally take place. Rowan Decl. ¶¶

9-10, 12; *see* Declaration of Rebecca Pierce (Pierce Decl.) ¶¶ 5, 15, 27, 29. This "gap" is significant and will result in unrecoverable economic harm to the State.

Projects that fall into the newly created permitting gap include projects that are directly related to protecting Colorado's water supply, improving Colorado's stream banks, building new developments, expanding existing businesses, and otherwise advancing Colorado's infrastructure and economy. Rowan Decl. ¶ 11; Pierce Decl. ¶¶ 2, 29. Without federal permits to authorize the discharges to state waters, the projects may need to be redesigned, causing delays and extra expenses, or may not be able to go forward at all. *See* Pierce Decl. ¶¶ 13, 16-19. Project delays and cancellations resulting from permitting issues could not come at a worse time for Colorado's economy, given record unemployment across several industries. Rowan Decl. ¶ 14. And no remedy exists to later recover these costs if Colorado succeeds at invalidating the 2020 Rule.

Colorado cannot simply start issuing dredge and fill permits on June 22. Establishing its own permitting program for dredge and fill activities will require legislative action and a lengthy implementation process. *Id.* ¶¶ 17, 19. Even if the State is able to complete the necessary legislative and regulatory steps to create a comprehensive new program, it comes with enormous unrecoverable costs at the expense of other important state programs. *Id.* ¶¶ 14-17.

**B.    The loss of federal protections will cause significant environmental harm to Colorado.**

The 2020 Rule's significant narrowing of federal jurisdiction will also contribute to the degradation of Colorado's environment in multiple ways. Until Colorado can implement its own comprehensive program, it is likely that some developers who previously sought federal permits may believe they are no longer subject to any regulatory oversight and will move forward with dredge and fill activities in nonjurisdictional waterways without taking the needed

steps to protect downstream waters and mitigate any remaining environmental harm. Such illegal activities will create significant environmental damage and, when identified, necessitate that Colorado take enforcement actions after the damage has already occurred. This also imposes an immediate compliance and enforcement burden on Colorado, which does not currently have dedicated funding or staffing resources to undertake enforcement against illegal fill activities and instead has relied on EPA and Corps oversight. Rowan Decl. ¶ 15.

The anticipated impacts of illegal dredge and fill projects will have significant water quality impacts in Colorado. First, dredge and fill activities in wetlands that are no longer subject to federal jurisdiction would impair important wetland functions and lead to additional downstream impacts, as explained in detail in the Klein Declaration. *See* Klein Decl. ¶¶ 12-14, 22. Filling in these ecologically critical wetlands, even in the absence of any other harms, constitutes irreparable environmental harm significant enough to merit a preliminary injunction. *Utahns For Better Transp. v. U.S. Dept. of Transp.*, No. 01-4216, 01-4217, 01-4220, 2001 WL 1739458, *2 (10th Cir. Nov. 16, 2001).

Second, illegal dredge and fill projects are likely to lead to a loss of aquatic habitat in Colorado's headwaters, where ephemeral and intermittent waters comprise at least 68 percent of Colorado's stream miles, as explained in detail in the Bachman and Crockett declarations. Bachmann Decl. ¶¶ 5-7; Declaration of Harry Crockett (Crockett Decl.) ¶¶ 5-16. The narrowing of federal jurisdiction leaves a large percentage of Colorado's stream miles, as well as the wide diversity of life within them (including threatened and endangered species), without the federal protections they currently enjoy. Bachmann Decl. ¶¶ 8-9; Declaration of Melynda May (May Decl.) ¶ 11; Crockett Decl. ¶ 16. The flow contributed from these systems, to a large degree,

determines water quality in downstream perennial reaches. Bachman Decl. ¶ 9. Colorado will

likely suffer other environmental harms as well, including impacts on downstream drinking

water sources and on farmers' ability to use downstream water rights for agriculture. Klein

Decl. ¶ 23; Bachmann Decl. ¶ 10. Degradation of these headwaters would also impact

Colorado's recreation economy, to which fishing alone contributes $2.4 billion in annual

economic output, supporting over 17,000 jobs. Southwick Associates, *The 2017 Economic

Contributions of Outdoor Recreation in Colorado*, 2, 7 (Jul. 23, 2018), attached as Exhibit 4.

Healthy aquatic and wetland habitats and good water quality are critical for preserving

Colorado's native fish species and providing outstanding recreational fishing. May Decl. ¶ 6.

The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that

he or she will experience harm that cannot be compensated after the fact by monetary damages."

*Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (quoting *Adams v. Freedom

Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000)). Here, the likelihood of imminent harm to

Colorado's wetlands, wildlife, and water resources entitles the State to an injunction. *See San

Luis Valley Ecosystem Council v. U.S. Fish and Wildlife*, 657 F.Supp.2d 1233, 1240-41 (D. Colo.

2009) (concluding that drilling of wells in wildlife refuge would be likely to cause irreparable

injury to plaintiffs' environmental interests based in part on evidence that construction will

impact water sources and could harm endangered species); *Envtl. Def. Fund, Inc. v. Corps of

Eng'rs. of U.S. Army*, 324 F.Supp. 878, 880 (D.D.C. 1971).

## II.    Colorado is likely to succeed on the merits of its claims.

Colorado asserts five causes of action against the Agencies under the APA and NEPA.

Although Colorado need only demonstrate a likelihood of success on one cause of action to

prevail on this requirement, it is likely to succeed on all five counts.

The APA, 5 U.S.C. §§ 551 *et seq*., governs the requirements for federal agency decision-making, including the agency rulemaking process. A rule is unlawful and must be set aside when an agency acts "in excess of statutory jurisdiction, authority [and] short of statutory right," "without observance of procedure required by law," and in a manner that is "arbitrary, capricious [and] … not in accordance with law." 5 U.S.C. § 706(2). A rule is arbitrary and capricious if "the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that is counter to evidence before the agency, or is so implausible that it could not be attributable to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983); *see also N.M. ex Rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009).

### A.  The 2020 Rule is inconsistent with the language and purpose of the Clean Water Act and its interpretation by the U.S. Supreme Court.

The 2020 Rule is inconsistent with the Clean Water Act's purpose "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *See County of Maui v. Hawaii Wildlife Fund*, 140 S.Ct. 1462, 1468 (2020). In construing the meaning of terms in the Clean Water Act, the Supreme Court looks to legislative purpose, statutory structure, legislative history, and longstanding regulatory practice. *Id.* at 1470-73. An examination of these factors demonstrates that the 2020 Rule is contrary to the Act and unlawful.

### 1.  The 2020 Rule is contrary to the Act's purpose and legislative history.

By stripping federal protections away from headwaters and wetlands that meet the *Rapanos* significant nexus test, the 2020 Rule will fundamentally undermine the basic goal of the

Clean Water Act. A categorical rule that shifts to Colorado the regulatory burden to protect a significant number of waters that may not have direct surface connections to traditional navigable waters, but which nonetheless have impacts on such waters, conflicts with Congress' intent to create a federal-state partnership in which both the Agencies and states would work together to protect the broadly defined "waters of the United States." *See Int'l Paper Co. v. Ouellette*, 479 U.S 481, 489-490 (1987) (observing that the Clean Water Act establishes a regulatory 'partnership' between the Federal Government and the source State").

There is nothing in the Clean Water Act to suggest that Congress intended to balance water quality against state sovereignty by limiting the scope of "waters of the United States" to the narrow definition in the 2020 Rule. Indeed, the legislative history indicates that Congress intended a broad interpretation of "waters of the United States" that would extend as far as was permissible under the Commerce Clause: "The conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation." *See* H.R.Rep. No. 92–911, 92d Cong., p. 131 (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3776, 3822; 118 Cong.Rec. 33692, 33699 (1972) (statement of Senator Muskie); 118 Cong.Rec. 33756–57 (1972) (statement of Rep. Dingell). The purpose of the 1972 Amendments was to expand, not narrow federal protection of water quality. *See* S. Rep. No. 92-414, 92d Cong., p. 7 (1972) (prior mechanisms for abating water pollution "ha[d] been inadequate in every vital respect.").

**2.      The 2020 Rule adopts an impermissible construction of "waters of the United States."**

The 2020 Rule purports to rely on the *Rapanos* plurality's "relatively permanent waters" test. This test is inconsistent with the language of the Clean Water Act and the Supreme Court's controlling interpretation of the statute's reach. Relying on the Act's text and purpose, between

the late 1970s and the early 2000s, courts and the Agencies applied the Act broadly to protect

many kinds of water bodies, including streams and wetlands. *See, e.g., Riverside Bayview*

*Homes, Inc.*, 474 U.S. at 123-24, 131-39. In 1985, the United States Supreme Court recognized

that the Clean Water Act extends federal regulatory jurisdiction over waters and wetlands that

"have significant effects on water quality and the aquatic ecosystem." *Id*. at 135 n.9. In 2001, the

Supreme Court recognized that "[i]t was the significant nexus between the wetlands and

'navigable waters' that informed [its] reading of the [Clean Water Act] in *Riverside Bayview*

*Homes*." *SWANCC*, 531 U.S. at 167.

     In *Rapanos*, the Court addressed the question of whether the Clean Water Act's

protections could be extended to wetlands that "are not adjacent to waters that are navigable in

fact." 547 U.S. at 759 (Kennedy, J., concurring). No opinion garnered a majority of the Court. In

an opinion joined by three other members of the Court, Justice Scalia held that the term

"navigable waters" in the Clean Water Act extends only to waters with "a significant surface

connection" to "relatively permanent, standing or continuously flowing bodies of water." *Id*. at

739, 742. Five Justices rejected Justice Scalia's holding, and the four dissenting Justices joined

Justice Kennedy's concurring opinion on the scope of Clean Water Act jurisdiction. *Id*. at 759-86

(Kennedy, J. concurring), 786-812 (Stevens, J., joined by Souter, Breyer, and Ginsberg, JJ.,

dissenting). In his concurrence, Justice Kennedy applied the Court's prior decisions recognizing

that a water must be given federal protections when it "possess[es] a 'significant nexus' to waters

that are or were navigable in fact or that could reasonably be so made." *Id*. at 759.

     Following *Rapanos*, the Agencies recognized that Justice Kennedy's opinion is

controlling, and they consistently included significant nexus analyses in making jurisdictional

determinations under the Act. *See, e.g.*, 2008 Guidance (attached as Exhibit 1). But the Agencies

now rely on the reasoning in the *Rapanos* plurality opinion instead of the controlling Justice

Kennedy concurring opinion. 85 Fed. Reg. 22,273. The Agencies' approach is inconsistent with

case law uniformly holding that the Kennedy concurrence in *Rapanos* is controlling. *See, e.g.*,

*Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 288-89 (4th Cir. 2011); *N.*

*Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011); *U.S. v. Donovan*, 661 F.3d 174,

183–84 (3d Cir. 2011); *U.S. v. Bailey*, 571 F.3d 791, 798–800 (8th Cir. 2009); *U.S. v. Johnson*,

467 F.3d 56, 66 (1st Cir. 2006); *U.S. v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *U.S. v.*

*Gerke Excavating, Inc.*, 464 F.3d 723, 724–25 (7th Cir. 2006). Other circuits have not

established a clear interpretation of *Rapanos*, but none has adopted the plurality's test alone or

rejected Justice Kennedy's standard. *See, e.g., U.S. v. Cundiff*, 555 F.3d 200, 208, 210–13 (6th

Cir. 2009); *U.S. v. Lucas*, 516 F.3d 316, 325–27 (5th Cir. 2008).

### B. The 2020 Rule contravenes longstanding regulatory practice and policy without a reasonable basis.

Agencies are not free to reverse national rules based on "political winds and currents"

without "measure[d] deliberation" and a "fair grounding in statutory text and evidence." *N.C.*

*Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J.,

concurring). Agencies may change existing policies, but in doing so must "provide a reasoned

explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)

(citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82

(2005)). To allow otherwise would leave regulated entities and states to the whim of bureaucracy

with no ability to plan.

While an agency need not show that a new rule is "better" than the rule it replaced, it must demonstrate that "it is permissible under the statute, that there are good reasons for it, and that the agency *believes it* to be better, which the conscious change of course adequately indicates." *Federal Commc'ns. Comm'n v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (emphasis in original). Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *Id*. (internal citation omitted). Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *National Cable & Telecomms. Ass'n*, 545 U.S. at 981; *see, e.g*., *Renewable Fuels Ass'n. v. U.S. Envtl. Prot. Agency*, 948 F.3d 1206 (10th Cir. 2020) (finding that EPA action ignoring or failing to provide reasons for deviating from prior studies in making decisions was arbitrary and capricious).

### 1. The Agencies disregard the reliance interest created by their long-standing implementation of Clean Water Act jurisdiction.

An agency that changes its long-standing position is required to consider and take into account significant reliance interests that have been engendered by the agency's prior position. *See California v. Azar*, 950 F.3d 1067, 1113 (9th Cir. 2020) (citing *Encino Motorcars, LLC*., 136 S.Ct. at 2126). An agency that fails to even mention the fact that its prior policy had engendered reliance has acted arbitrarily and capriciously. *See Nat'l Assn. for the Advancement of Colored People v. Trump*, 298 F.Supp.3d 209, 240 (D.D.C. Apr. 24, 2018).

Colorado has relied on the Agencies' long-standing position articulated in regulations and guidance, and has structured its water quality pollution control programs accordingly. Colorado

relies on the Section 404 permitting program administered by the Corps to regulate dredge and fill activity and protect critical streams and wetlands. Rowan Decl. ¶¶ 6-7. The 2020 Rule impermissibly abandons the significant nexus standard and the prior Agencies' position without addressing the Rule's impacts on Colorado's reliance on the significant nexus standard.

### 2.    The Agencies ignored key scientific evidence.

The Agencies' abandonment of the Supreme Court's "significant nexus" standard and resulting unprecedented contraction of federal Clean Water Act jurisdiction is not supported by any factual or scientific findings. The Agencies' only analysis of the 2020 Rule's impacts on water quality and potential benefits is set forth in "supporting analyses" described in two reports: *Economic Analysis for the Proposed Revised Definition of "Waters of the United States"* (Dec. 14, 2018) ("EA"), attached as Exhibit 5;and *Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States"* (Jan. 23, 2020) ("RPA"), attached as Exhibit 6. Neither of these reports provide a scientific underpinning for the Agencies' change in approach.

Indeed, the Agencies explicitly reject science in establishing the new rule. *See* 85 Fed. Reg. 22,261. This rejection of science is evident in the 2020 Rule's definition of tributary, which includes waters that flow continuously during certain times of a typical year, but categorically excludes ephemeral waters, despite the Agencies' statements in the record showing that ephemeral waters have significant downstream impacts on navigable waters. *See* EA, Exhibit 5, at 107; *see also* Connectivity Report, Exhibit 2, at ES-5, ES-7. This approach is in marked contrast to the Agencies' long-standing reliance on science to support jurisdictional determinations. The Connectivity Report, prepared to support the 2015 Rule, summarized

"current scientific understanding about the connectivity and mechanisms by which streams and wetlands, singly or in the aggregate, affect the physical, chemical, and biological integrity of downstream waters." Exhibit 2, at ES-1. It concluded a wetland need not abut a jurisdictional water or have a direct surface water connection to it for the wetland to have a significant nexus to the jurisdictional water. *Id*. at 6-6 – 6-8. The Agencies also ignored the recommendations of EPA's Science Advisory Board ("SAB"), which issued a commentary stating that the revised definition of "waters of the United States" "decreases protection for our Nation's waters and does not provide a scientific basis in support of its consistency with the objective of restoring and maintaining 'the chemical, physical and biological integrity' of these waters." Science Advisory Board Letter (Feb. 27, 2020), EPA-SAB-20-002, at 2, attached as Exhibit 7. The SAB articulated several findings to support this conclusion. *See id.* at 2-3.

But the 2020 Rule blatantly rejects the undisputed significant science developed in connection with previous rulemaking and the Connectivity Report, as well as the recommendations of the SAB. Declaration of Karen Hamilton (Hamilton Decl.) ¶¶ 6, 8. The Agencies offer no new scientific evidence contradicting their previous findings that tributaries and adjacent wetlands can have a significant nexus to downstream jurisdictional waters even without a direct surface water connection. *See* Exhibit 2 at 2-22 – 2-29; ES-2; 6-1; 6-3. The Connectivity Report compiles the best science concerning the hydrologic interconnectedness of waterbodies and the functions they serve, which certainly hold true in Colorado. Declaration of Michael Gooseff ¶ 7; Bachmann Decl. ¶¶ 16-18.

> **3.** **The Agencies relied on improper factors to justify the policy change, including a flawed economic analysis.**

A regulation is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider [or] entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 42. An agency fails to consider an important aspect of the problem when it fails to address evidence that runs counter to the agency's decision. *Genuine Parts Co. v. Envtl. Prot. Agency*, 890 F.3d 304, 308 (D.C. Cir. 2018). In promulgating Clean Water Act regulations, the Agencies must consider and weigh the water quality impacts of their rules. *Nat'l Cotton Council of Am. v. Envtl. Prot. Agency*, 553 F.3d 927, 939 (6th Cir. 2009); *see Office of Commc'n of the United Church of Christ v. Fed. Commc'n Comm'n*, 779 F.2d 702, 707 (D.C. Cir. 1985). If federal agencies rely on an economic analysis to justify a rule, "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *City of Portland v. Envtl. Prot. Agency*, 507 F.3d 706, 713 (D.C.Cir. 2007) (noting that "we will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses").

The Agencies improperly relied on factors that Congress did not intend the Agencies to consider by incorporating an expectation that states would be able to fill in the gaps in clean water protection, making the rule arbitrary and capricious. While the states play an important role in implementing permit programs and retain sovereign authority over the allocation of water quantities within their jurisdictions, the Clean Water Act places the overarching responsibility on the Agencies to set the agenda for water quality protection nationwide. The 2020 Rule assumes that states will protect waters removed from federal jurisdiction, *see* RPA (Exhibit 6), but does not give the appropriate time for states to implement such protections in the wake of the dramatic reduction in federal protections. Indeed, the Agencies admit that they were unable to "predict

what changes [in state regulations] might result from the final rule." EA (Exhibit 5) at 35. The Agencies made no comparisons between the 2020 Rule and the 2008 Guidance, and failed to determine the degree to which the 2020 Rule would result in a loss of federal jurisdiction over waters that were previously determined to be jurisdictional. RPA (Exhibit 6) at 10. The Agencies evaluated the states' responses to a contraction of federal jurisdiction to determine the avoided costs and foregone water quality and wetland benefits of the rule, but rely on the speculative assumption that states will assume jurisdiction of waters no longer covered by the federal Act. EA (Exhibit 5) at 44-45.

The Economic Analysis also makes incorrect assumptions about Colorado. For example, it states that "[i]n states that regulate waters, including wetlands, more broadly than the Clean Water Act, the agencies would expect little to no direct effect on costs or benefits." EA (Exhibit 5) at 39. Colorado regulates waters, including wetlands, more broadly than the federal Act in the context of Section 402 discharge permits. However, Colorado expects the 2020 Rule to result in significant costs, particularly due to the Section 404 permitting gap. Rowan Decl. ¶¶ 17-19. The Economic Analysis also incorrectly concludes that Colorado is "[u]nlikely to increase state regulatory practices to address changes in federal jurisdiction," EA (Exhibit 5) at 39-40.

### C.     The 2020 Rule was promulgated without sufficient opportunity to comment on the concept of a "typical year."

Before an agency may finalize a rule, it must provide the public with a meaningful opportunity to participate in the rulemaking process, including an opportunity to submit comments on the proposed rule and the information supporting the rule. 5 U.S.C. § 553(c). The purpose of this requirement is to give the affected public an opportunity to provide meaningfully informed comment on an agency's proposal. *See Home Box Office, Inc. v. Fed. Commc'ns*

*Comm'n*, 567 F.2d 9, 35-36 (D.C.Cir. 1977); *see also Horsehead Res. Dev. Co., Inc. v. Browner*, 16 F.3d 1246, 1268 (D.C.Cir. 1994). Where a proposed regulation eliminates protections, notice and comment also "ensures that … [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of [the removal of protections]." *Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).

The 2020 Rule was promulgated without sufficient opportunity to comment on how the Agencies will determine a "typical year" to determine whether waters are jurisdictional or on how the Agencies will evaluate whether intermittent streams contribute flow to traditional navigable waters. Under the 2020 Rule, the jurisdictional status of intermittent waters depends on whether they contribute surface flow to a traditional navigable water in a typical year. The 2020 Rule defines a "typical year" to mean a year within the normal range of precipitation over a rolling thirty-year period for a particular geographic area, not including times of drought or extreme flooding. 33 C.F.R. § 328.3(c)(13); 40 C.F.R. § 120.2(3)(xiii). It does not explain or provide any resources (like a flow model) to determine this "typical year" or what it would mean to contribute surface flow to a traditional navigable water in that year, which may be particularly difficult to determine in Colorado. Bachmann Decl. ¶¶ 16, 20. Without more information, Colorado could not accurately evaluate whether its many of its waters would be within federal jurisdiction, *id.* at ¶¶ 18, 20, and thus did not have a meaningful opportunity to comment.

**D.      The Corps failed to comply with the requirements of NEPA**

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). It requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In "certain narrow instances," an agency does not have to prepare this analysis if the action to be taken falls under a categorical exclusion ("CE"). *See Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp*., 843 F.3d 886, 902 (10th Cir. 2016) (citing 40 C.F.R. § 1508.4). Agencies may invoke a CE, however, only for "a category of actions which do not individually or cumulatively have a significant effect on the human environment" and which are set forth in procedures adopted by a federal agency in implementation of NEPA regulations. 40 C.F.R. § 1508.4; *see also id*. § 1507.3(b)(2)(ii).

Promulgation of the 2020 Rule is a major federal action significantly affecting the quality of the human environment within the meaning of NEPA, requiring an analysis of the Rule's impacts. *See* 40 C.F.R. § 1508.18. Although actions of the EPA Administrator under the Clean Water Act are exempt from NEPA, the plain language of the exemption does not apply to the Corps. *See* 33 U.S.C. § 1371(c)(1). The Corps promulgated the 2020 Rule without the required NEPA analysis of the Rule's potential environmental impacts in violation of NEPA, and the Rule must be set aside until the appropriate environmental review is completed. *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F.Supp.3d 1262, 1263 (D. Colo. 2014) ("Vacatur is the normal remedy" for NEPA violation).

## III.    The balance of harms weighs heavily in Colorado's favor.

The balance of harms weighs in favor of the prohibitory injunction requested by

Colorado because delaying implementation of the 2020 Rule will preserve the status quo and allow the Agencies to continue applying current guidance and regulations to federal jurisdictional determinations, while Colorado will suffer significant, imminent, and irreparable harm from implementation of the 2020 Rule. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (favoring injunctions that preserve the status quo); *Pelletier v. U.S.*, 11-CV-01377-WJM-CBS, 2011 WL 2077828, *4 (D. Colo. May 25, 2011) (factor requires that "the possible harm to the Plaintiff if the injunction is not entered be balanced against the possible harm to the Defendant[s] if the injunction is entered.").

## IV.   An injunction would not be adverse to the public interest.

When a case is brought under an environmental statute, the courts place extraordinary weight on a general concern for the public interest. *See Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1171 (D. Wyo. 1998). Here, the public interest will be served by enjoining the 2020 Rule until its legality has been thoroughly reviewed by the Court. Enjoining a rule that will significantly narrow the Agencies' jurisdiction, with resulting environmental degradation and economic consequences to the citizens of Colorado, will protect rather than harm the public's interest in clean water and a functioning Clean Water Act permitting system. *See Amoco Prod. Co*. 480 U.S. at 545. Allowing the rule to go into effect on June 22, only to be enjoined later, will create unnecessary confusion and inconsistent regulatory structures, contrary to the Agencies' stated intent to increase predictability. 85 Fed. Reg. 22,250.

## CONCLUSION

For all the reasons set forth above, Colorado requests that this Court issue a preliminary injunction enjoining the Agencies from implementing the 2020 Rule on June 22, 2020.

Respectfully submitted this June 1, 2020.

PHILIP J. WEISER
Attorney General

_s/ Carrie Noteboom_
ERIC R. OLSON*
CARRIE NOTEBOOM*
ANNETTE M. QUILL*
JENNIFER H. HUNT*
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO  80203
Telephone:     720-508-6215
FAX:              720-508-6032
E-Mail:          eric.olson@coag.gov;
                     carrie.noteboom@coag.gov;
                     annette.quill@coag.gov;
                     Jennifer.hunt@coag.gov
*Counsel of Record

Attorneys for the State of Colorado