**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01461-WJM-NRN

THE STATE OF COLORADO,

     Plaintiff,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental
Protection Agency;
U.S. ARMY CORPS OF ENGINEERS; and
R.D. JAMES, in his official capacity as Assistant Secretary of the Army for Civil Works,

     Defendants.

---

**OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION
DKT. NO. 24**

---

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ........................................................................................................... iii

Introduction ......................................................................................................................... 1

Background ........................................................................................................................... 2

I.      Clean Water Act .................................................................................................... 2

II.     Prior Regulatory Definitions of "Waters of the United States" and Litigation ................. 3

III.    The Navigable Waters Protection Rule .............................................................. 4

Standard of Review ............................................................................................................ 5

Argument .............................................................................................................................. 6

I.      Colorado Has Not Shown that It Is Likely to Succeed on the Merits. ............... 6

        A.      *Chevron* Requires Deference to the Agencies' Reasonable Interpretation. ............ 6

        B.      The Navigable Waters Protection Rule Is Neither Arbitrary nor
                Capricious. ............................................................................................... 9

                1.      The Agencies Addressed Any Reliance Interests. ......................... 10

                2.      The Agencies Explained Their Consideration of Science. .............. 11

                3.      The Agencies Did Not Rely on the Economic Analysis or the Resource
                        and Programmatic Assessment as a Basis for the Rule. ................. 13

                4.      Colorado Had Ample Opportunity to Comment on "Typical Year." .......... 14

        C.      The Agencies Did Not Violate the National Environmental Policy Act. ............. 15

II.     Colorado Has Failed to Meet Its Burden of Showing Irreparable Harm. ............ 16

        A.      Colorado's Alleged Harms Are Not Legally Cognizable. ....................... 17

        B.      Colorado's Insufficient Evidence Does Not Support Its Speculative Harm. ......... 19

III.     The Public Interest and the Balance of Harms Weighs in the Agencies' Favor................ 21

Conclusion ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) ............................................................................................ 18

*Allied Local & Regional Mfrs. Caucus v. EPA*,
    215 F. 3d 61 (D.C. Cir. 2000) ............................................................................ 14

*Am. Min. Cong. v. Marshall*,
    671 F.2d 1251 (10th Cir. 1982) ........................................................................ 14

*Amisub (PSL), Inc. v. State of Colo. Dep't of Soc. Servs*.,
    879 F.2d 789 (10th Cir. 1989) ............................................................................ 6

*Bennett v. Spear*,
    520 U.S. 154, (1997) .......................................................................................... 19

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
    846 F.3d 492 (2d Cir. 2017) ................................................................................ 9

*Chamber of Commerce of U.S. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011) .......................................................................... 18

*Chevron v. NRDC*,
    467 U.S. 837 (1984) ............................................................................................ 6

*City & Cty. of San Fran. v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .......................................................................... 22

*Corps v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) .................................................................................... 2, 10

*Ctr. for Food Safety v. Vilsack*,
    718 F. 3d 829 (9th Cir. 2013) ............................................................................ 16

*Cty. of Maui v. Haw. Wildlife Fund*,
    140 S.Ct. 1462 (2020) .......................................................................................... 9

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ............................................................................................ 16

*Diné Citizens Against Ruining Our Env't v. Jewell*,
   839 F.3d 1276 (10th Cir. 2016) ............................................................... 5

*Duquesne Light Co. v. EPA*,
   166 F.3d 609 (3d Cir. 1999) ................................................................... 19

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ............................................................... 22

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ................................................................................ 6

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................................... 9, 10

*Georgia v. Wheeler*,
   418 F. Supp. 3d 1336 (S.D. Ga. 2018) ............................................... 2, 4

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ............................................................. 21

*In re U.S. Dep't of Def.*, 817 F.3d 261 (6th Cir. 2016)
   *rev'd on other grounds sub nom. Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   138 S. Ct. 617 (2018) ...................................................................... 15, 16

*Macon Cty. Samaritan Mem'l Hosp. v. Shalala*,
   7 F.3d 762 (8th Cir. 1993) .................................................................... 13

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................................ 6

*Monsanto Co v Geertson Seed Farms*,
   561 U.S. 139 (2010) .............................................................................. 22

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ................................................................................ 9

*Municipality of Anchorage v. United States*,
   980 F.2d 1320 (9th Cir. 1992) ............................................................... 15

*N.M. Dep't of Game & Fish v. DOI*,
   854 F.3d 1236 (10th Cir. 2017) ......................................................... 5, 19

*Nat'l Cable & Telecomm'ns Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ..................................................................................... 1, 6, 7

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................... 21

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) ........................................................................................... 19

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
810 F.3d 827 (D.C. Cir. 2016) ........................................................................... 18

*Rapanos v. United States*,
547 U.S. 715 (2006) ............................................................................. 1, 3, 7, 10

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) .................................................................... 19, 20

*Rodriguez v. United States*,
480 U.S. 522 (1987) ............................................................................................. 9

*Sierra Club v. Corps*,
990 F. Supp. 2d 9 (D.D.C. 2013) ....................................................................... 21

*Solid Waste Agency of N. Cook Cty. v. Corps*,
531 U.S. 159 (2001) ......................................................................................... 3, 8

*Texas v. EPA*,
389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................................. 4

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ............................................................................................. 7

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) ........................................................................................... 22

*United States v. Riverside Bayview Homes, Inc.*,
474 U.S. 121 (1985) ......................................................................................... 3, 8

*Utahns for Better Transp. v. DOT*,
No. 01-4216, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) .............................. 20

*W. Wood Preserves v. McHugh,*
  925 F. Supp. 2d 63 (D.D.C. 2013) ......................................................................... 14

*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................................................ 5, 21

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................................... 6

5 U.S.C. § 706(2)(C) ................................................................................................... 6

33 U.S.C. § 1251 ......................................................................................................... 2

33 U.S.C. § 1251(a) ................................................................................................. 2, 9

33 U.S.C. § 1251(b) ............................................................................................. 2, 8, 9

33 U.S.C. § 1311(a) ..................................................................................................... 2

33 U.S.C. § 1342 ......................................................................................................... 2

33 U.S.C. § 1344 ....................................................................................................... 15

33 U.S.C. § 1344(a) ..................................................................................................... 3

33 U.S.C. § 1344(d) ..................................................................................................... 3

33 U.S.C. § 1344(g) ..................................................................................................... 3

33 U.S.C. § 1362(7) ................................................................................................. 2, 8

33 U.S.C. § 1371(c)(1) .............................................................................................. 15

Colo. Rev. Stat. § 25-8-302(1)(b) ............................................................................. 16

Colo. Rev. Stat. § 25-8-103(19) ................................................................................ 17

Colo. Rev. Stat. § 25-8-501(1) .................................................................................. 17

**Rules**

Fed. R. Civ. P. 65(d) ................................................................................................................... 20

Fed. R. Evid. 602 ........................................................................................................................ 20

**Federal Regulations**

51 Fed. Reg. 41,206 (Nov. 13, 1986) ............................................................................................ 3

53 Fed. Reg. 20,764 (June 6, 1988) .............................................................................................. 3

80 Fed. Reg. 37,054 (June 29, 2015) ................................................................................. 4, 12, 15

84 Fed. Reg. 4154 (Feb. 14, 2019) ....................................................................................... 14, 15

84 Fed. Reg. 56,626 (Oct. 22, 2019) ............................................................................................ 4

85 Fed. Reg. 22,250 (Apr. 21, 2020) ..................................................... 1, 4, 5, 8, 10, 11, 12, 13, 14

Defendants (the "Agencies") respectfully request that the Court deny Plaintiff's amended motion, Dkt. No. 24, which seeks to preliminarily enjoin the Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR").

## INTRODUCTION

What constitutes a "water of the United States" is a textbook example of statutory ambiguity for which agencies are "delegat[ed] authority to . . . fill the statutory gap in reasonable fashion." *Nat'l Cable & Telecomm'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The only question for this Court is whether the NWPR is a reasonable construction of the Clean Water Act ("CWA"). Such "agency construction" will displace even prior *judicial* decisions unless such a holding "follow[ed] from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. Here, the NWPR is well within the "generous leeway by the courts" for agencies to "develop[] *some* notion of an outer bound to the reach of their authority." *Rapanos v. United States*, 547 U.S. 715, 758 (2006) (Roberts, C.J., concurring).

Colorado's alternative—applying 30-year old regulations that have been the subject of critical and unclear Supreme Court opinions—is neither in the public interest nor supported by the case law. The Agencies reasonably drew the lines of CWA jurisdiction. They explained why. And their delegated interpretative and technical judgments are entitled to great deference by courts.

Colorado primarily argues that the Agencies' ***more than 1,500 pages*** of legal, scientific, technical, and other analysis in the NWPR's preamble and supporting documents do not sufficiently explain why the Agencies are replacing the "significant nexus" test. But despite post-*Rapanos* application of that standard, the reach of the CWA has been described as "notoriously unclear"—including by the Justice who offered that standard. *Corps v. Hawkes Co.*, 136 S. Ct.

1807, 1816 (2016) (Kennedy, J., concurring). The Agencies' attempt to incorporate the significant nexus standard in a 2015 rule was held "unlawful," contrary to the text of the CWA, and remanded to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019). Before its repeal, nearly a half dozen courts had stayed or enjoined the 2015 Rule because of the likelihood of successfully invalidating the rule—including in a case brought by Colorado.

Contrary to Colorado's allegations now, the Agencies did consider and weigh their prior scientific findings when promulgating the NWPR. They recognized that not all waters are the same, but fall on a continuum. The Agencies thoroughly explained their balancing of the same factors now that they have in the past. Colorado has no likelihood of succeeding on the merits of its challenge to the NWPR. Colorado also fails to meet the high bar of demonstrating likely and imminent irreparable harm upon the effective date of the Rule. Indeed, as explained more thoroughly below, Colorado's claims lack any specificity of harm pending summary judgment.

## BACKGROUND

### I.  Clean Water Act

Congress enacted the CWA, 33 U.S.C. § 1251 *et seq.*, with the objective of restoring and maintaining "the chemical, physical, and biological integrity of the Nation's waters," *id*. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b). The Act prohibits "the discharge of any pollutant by any person," 33 U.S.C. § 1311(a), to "navigable waters," defined as "the waters of the United States," *id*. § 1362(7), without a permit. EPA or authorized states (including Colorado) issue National Pollutant Discharge Elimination System (or "section 402") permits for the discharge of pollutants other than dredged or fill material. *Id.* § 1342. For

discharges of dredged or fill material, the Secretary of the Army acting through the Corps, or a state or tribe with an assumed program, may issue "section 404" permits. *Id.* § 1344(a), (d), (g).

## II.      Prior Regulatory Definitions of "Waters of the United States" and Litigation

In the 1980s, the Agencies adopted the current form of the regulatory definition of "waters of the United States." *See* 51 Fed. Reg. 41,206 (Nov. 13, 1986) (Corps); *see also* 53 Fed. Reg. 20,764 (June 6, 1988) (EPA). The Agencies administratively modified their application of this definition in light of three Supreme Court decisions.

In *United States v. Riverside Bayview Homes, Inc.*, the Court deferred to the Corps' claim of jurisdiction over wetlands "actually abut[ting]" a traditional navigable water. 474 U.S. 121, 131-35 & n.9 (1985). Later, in *Solid Waste Agency of Northern Cook County v. Corps*, 531 U.S. 159, 67-68, 171-72 (2001) ("*SWANCC*"), the Court rejected the Corps' broad reading of its regulations, including the Corps' claim of jurisdiction over non-navigable, isolated, intrastate waters. In that as-applied challenge, the Court held that the term "navigable" must be given meaning within the context of the CWA. *Id.* In *Rapanos*, the Court again assessed an expansive application of the 1986 regulations, and remanded the Corps' assertion of jurisdiction over several wetlands. 547 U.S. at 757 (Scalia, J., plurality); *id.* at 786-87 (Kennedy, J., concurring). The plurality said the CWA limited "waters of the United States" to traditional navigable waters and "relatively permanent bod[ies] of water connected to traditional interstate navigable waters" or "wetlands with a continuous surface connection" to such waters. *Id.* at 739, 742. Justice Kennedy reasoned that the CWA's jurisdiction extends to waters having a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring in judgment).

In 2015, the Agencies revised the regulatory definition of "waters of the United States." *See* 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). They claimed Justice Kennedy's "significant nexus" discussion as the legal touchstone. The Agencies prepared a scientific literature review—the "Connectivity Report"—to inform their assertion of federal jurisdiction over certain waters. *See id.* at 37,062. Parties, including Colorado, challenged the 2015 Rule in multiple courts across the country. Colorado argued that the 2015 Rule encroached onto states' rights, arguing that "the limits of federal jurisdiction, not environmental protection" were at issue. *North Dakota v. EPA*, No. 3:15-cv-59, Dkt. No. 212 at 33 (D.N.D. June 1, 2018). A court of appeals and numerous district courts stayed or enjoined the 2015 Rule. In addition, both courts ruling on summary judgment concluded that the 2015 Rule was "unlawful" and remanded it. *Georgia*, 418 F. Supp. 3d at 1360; *Texas v. EPA*, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019).

In 2019, the Agencies issued a rule repealing the 2015 Rule and reinstating the pre-2015 Rule regulatory definition. 84 Fed. Reg. 56,626 (Oct. 22, 2019). That Rule went into effect on December 23, 2019. *Id.* Parties have also challenged that Rule. *See* Dkt. No. 35 at 2.

## III.    The Navigable Waters Protection Rule

The NWPR revises the definition of "waters of the United States." It goes into effect on June 22, 2020. 85 Fed. Reg. 22,250. The NWPR defines the limits of federal jurisdiction consistent with the Constitution, CWA, and case law. It establishes categorical bright lines that improve regulatory clarity, defining "waters of the United States" as: "(1) The territorial seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than waters that are themselves wetlands)." *Id.* at 22,273. The NWPR also "exclu[des] . . . many water features

that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id.* at 22,270. Ephemeral features are excluded under the NWPR. *Id.* at 22,340. But certain discharges of pollutants to non-jurisdictional waters remain regulated under the Rule if those discharges are conveyed to downstream navigable waters. *Id.* at 22,297. The Agencies thoroughly explained their decisions in technical analyses and legal discussion spanning more than 1,500 pages across the final rule preamble, the Resource and Programmatic Assessment ("RPA"), the Economic Analysis ("EA"), and a Response to Comments document ("RTC").[1]

Colorado filed this lawsuit on May 22, 2020, asserting procedural and substantive flaws. After a first motion for preliminary injunction was struck, *see* Dkt. No. 18, Colorado filed an amended motion. Dkt. No. 24 (hereinafter "Mot.").

### STANDARD OF REVIEW

To obtain a preliminary injunction, Colorado "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A movant fails to meet its burden if it does not satisfy each and every one of the four factors. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). The Court may not issue an injunction based on the mere possibility of irreparable harm. *N.M. Dep't of Game & Fish v. DOI*, 854 F.3d 1236, 1253 (10th Cir. 2017).

---

[1] The pre-publication version of the final rule is 340 pages requiring 279 columns of the Federal Register, spanning 93 of those pages. 85 Fed. Reg. at 25,250. The RPA and EA are available at https://www.epa.gov/nwpr/navigable-waters-protection-rule-supporting-documents; the RTC is available at https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-11574.

In assessing Colorado's likelihood of success on the merits, the Court must apply the Administrative Procedure Act ("APA") standard, 5 U.S.C. § 706(2)(A), (C). Agency action may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 n.21 (1989). Review under this standard is "highly deferential"; an agency's action is presumed valid if a reasonable basis exists for its decision. *Amisub (PSL), Inc. v. Colo. Dep't of Soc. Servs.*, 879 F.2d 789, 800 (10th Cir. 1989).

## ARGUMENT

### I.   Colorado Has Not Shown that It Is Likely to Succeed on the Merits.

#### A.   *Chevron* Requires Deference to the Agencies' Reasonable Interpretation.

Where, as here, a rule contains an agency's interpretation of statutory language, the Court reviews that interpretation pursuant to *Chevron v. NRDC*, 467 U.S. 837 (1984). Because the CWA is "ambiguous with respect to the specific issue," the Court must determine whether the NWPR is "based on a permissible construction of the statute." *Id.* at 843. To be upheld, the Agencies' interpretation of the CWA need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Because delegated "agencies are better equipped to make [difficult policies choices] than courts." *Brand X*, 545 U.S. at 980. So, critically, a "court's prior judicial construction of a statute trumps an agency construction" only if the court held "that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982.

Colorado argues that Justice Kennedy's "significant nexus" test in *Rapanos* bars the Agencies' interpretation in the NWPR. This is entirely wrong. First, even if Justice Kennedy's

concurrence in *Rapanos* were the "controlling" opinion of that case, this does not preclude the Agencies from promulgating a new regulatory definition. *Brand X*, 545 U.S. at 982; *United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009) (holding agencies can adopt a different interpretation of an ambiguous statute than a prior court decision). Colorado does not even contend the term "waters of the United States" is unambiguous—for good reason. The Supreme Court, including Justice Kennedy, has recognized the "ambiguity in the phrase 'navigable waters'" including waters of the United States. *E.g.*, *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring); *id.* at 752 (plurality) (the Act "is in *some* respects ambiguous"); *id.* at 796 (Stevens, J., dissenting) (noting "ambiguity inherent in the phrase 'waters of the United States'"). The Agencies are therefore entitled to wide deference under *Chevron* to reinterpret the Act.

Second, the interpretive logic of Justice Kennedy's "significant nexus" standard is not compelling—as the eight other justices declined to adopt it. *E.g.*, 547 U.S. at 756 (plurality) (reasoning that the "significant nexus" standard "simply rewrites the statute"); *id.* at 807 (Stevens, J., dissenting) (opining that the "significant nexus" standard should not "replace regulatory standards that have been in place for over 30 years"). Even Justice Kennedy gave the significant nexus test merely to guide "[a]bsent more specific regulations . . . [g]iven the potential overbreadth of the [Agencies'] regulations . . . to avoid unreasonable applications of the statute." *Id.* at 782 (Kennedy, J., concurring). Accordingly, under *Brand X*, the Agencies were empowered to expressly reconsider their prior statutory interpretation. *See also*, 547 U.S. at 758 (Roberts, C.J., concurring).

The NWPR is, first and foremost, based on the text of the statute, though informed by the Supreme Court. When assessing the scope of CWA jurisdiction over wetlands, the Supreme Court

7

recognized Congress' intent to regulate some "waters" that would not actually be "'navigable' under the classical understanding of that term." 85 Fed. Reg. at 22,262 (citing *Riverside Bayview*, 474 U.S. at 133). "[T]he term 'navigable' nonetheless reflects 'what Congress had in mind as its authority for enacting the CWA.'" *Id.* (citing *SWANCC*, 531 U.S. at 172). For the Court noted nothing in the CWA's legislative history indicates that "Congress intended to exert anything more than its commerce power over navigation." *Id.* (citing *SWANCC*, 531 U.S. at 168 n.3). So the Supreme Court holds some waters are beyond the CWA's scope. *See id.* at 22,256.

To draw that line, the Agencies particularly analyzed the "commonalities" between the plurality's and Justice Kennedy's opinions in the fractured *Rapanos* decision, as well as the earlier *SWANCC* decision. *Id.* at 22,268. Considering those, the NWPR avoids regulating non-navigable, isolated, waters that lack a sufficient connection to traditional navigable waters. Congress also sought "to preserve and protect" the power of states to regulate water resources and land within their borders. 33 U.S.C. § 1251(b). So the NWPR also honors that policy. At bottom, its "unifying legal theory"—consistent with this statutory text and Supreme Court guidance—asserts "federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,271.

Colorado suggests the generalized objective of § 1251(a) and legislative history indicating "that Congress intended a broad interpretation" somehow unambiguously overrides the Agencies' *Chevron* delegation to interpret the specific "navigable waters" definition in 33 U.S.C. § 1362(7). Mot. at 12. It does not. Indeed, the Agencies did give the statute a "broad interpretation" by extending navigable "waters" to wet*lands*—as the Supreme Court held permissible in *Riverside Bayview*. But the Supreme Court rejects Colorado's overbroad use of statutory "objectives" to try

to override specific statutory text in implementing provisions. Courts must "give the statute the effect its language suggests, however modest that may be; not [] extend it to admirable purposes it might be used to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270 (2010); *see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 501 (2d Cir. 2017) (finding EPA's interpretation reasonable—even if, in the court's view, it was not "best designed to achieve the Act's overall goal of restoring and protecting the quality of the nation's water"); *see also Rodriguez v. United States* 480 U.S. 522, 525-26 (1987) ("[N]o legislation pursues its purposes at all costs.").

Contrary to Colorado's claim, the Agencies fully considered the CWA's objective to maintain the integrity of the Nation's waters. 33 U.S.C. § 1251(a). But it was also appropriate to consider the specific text of 33 U.S.C. § 1362(7), as well as the other policy directives expressed in the CWA. This included, as Congress did, recognizing and protecting the states' large role in implementing the Act, and other rights. *See Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020); 33 U.S.C. § 1251(b) (policy "to recognize, preserve, and protect the primary responsibilities and rights of States"). Nothing in the Act unambiguously prohibits the Agencies' consideration of these factors. So the Agencies' interpretation must be upheld under *Chevron*. Colorado has no likelihood of success on the merits.

## B.     The Navigable Waters Protection Rule Is Neither Arbitrary nor Capricious.

Not only is the NWPR's interpretation of the CWA entirely reasonable under *Chevron*, the Agencies thoroughly explained their rationale. A court's review of this explanation is highly deferential, merely requiring that the Agencies explained why they "*believe* [the NWPR] to be better" than a significant nexus test. *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515

(2009). The Agencies' more than 1,500 pages of supporting documentation thoroughly explain that the NWPR was informed by the Act's policies and objectives; scientific principles; case law, including both the plurality and concurring opinions in *Rapanos*; and administrability.

### 1.   The Agencies Addressed Any Reliance Interests.

Colorado has failed to show that its "reliance" on the Agencies' prior position, and the Corps' CWA § 404 permitting program, renders the Agencies' explanation for the Rule inadequate, *see Fox*, 556 U.S. at 515. First, Colorado does not—and cannot—dispute that state reliance does not legally preclude the Agencies from changing their interpretation. If a "prior policy has engendered serious reliance interests," an agency may not ignore them. *Id.* But the Agencies did not do so. *See* RTC: Legal Arguments at 29. The Agencies provided a thorough and reasoned explanation for the changed definition. This included that "replacing the multi-factored case-specific significant nexus analysis with categorically jurisdictional and categorically excluded waters" provides better clarity for members of the regulated community. *See, e.g.*, 85 Fed. Reg. at 22,270. This is all the law required to address any "reliance" concerns.

Moreover, Colorado cannot credibly claim significant reliance interests in the "significant nexus" regime replaced by the NWPR. Even Justice Kennedy offered it as a stopgap "[a]bsent more specific regulations," *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring), and thereafter criticized the "notoriously unclear" scope of CWA jurisdiction that prevailed during the post-*Rapanos* regime. *Hawkes*, 136 S. Ct. at 1816 (Kennedy, J., concurring). And the Agencies' jurisdictional guidance following *Rapanos* suggested that the Agencies were looking to rewrite the regulations. *See* CWA Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States* at 3 (Dec. 2, 2008), Dkt. No. 24-1. So no interested party in America was unaware

the Agencies would do so. This included the Agencies' failed attempt to provide greater clarity through the 2015 Rule—which Colorado itself *successfully moved to enjoin as overbroad and unlawful*. Notice also included the President's E.O. 13778 of February 2017, directing the Agencies to reconsider the definition of "waters of the United States" consistent with Justice Scalia's opinion in *Rapanos*. *See* RTC: Legal Arguments at 29. The Agencies also posted the final rule to their websites back in *February*. Colorado can prove no justifiable reliance here.

### 2.     The Agencies Explained Their Consideration of Science.

Colorado also charges that the NWPR arbitrarily "rejects science," including the 2015 Connectivity Report. Mot. at 16-17. This is refuted by the voluminous scientific, technical, and other discussions in the primary analytical documents and appendices in the administrative record explaining how science informed and supported the NWPR.[2] The Agencies specifically considered the Connectivity Report. *E.g.*, 85 Fed. Reg. at 22,288-91. For example, the Agencies analyzed and applied the "connectivity gradient" and ecological interconnection between perennial, intermittent, and ephemeral streams and downstream waters within a tributary system, which informed the tributary definition. *E.g.*, *id.* at 22,288. The Agencies further looked to the Report, principles of hydrologic connectivity, and longstanding practice in defining the flow classifications used throughout the regulation, determining that inundation by flooding may establish jurisdiction, and using the "typical year" concept to inform what may be within a normal range of precipitation and

---

[2] Colorado also asserts that the Agencies ignored commentary of EPA's Science Advisory Board ("SAB"), Mot. at 17, but that letter post-dates the NWPR's finalization. Thus, it could not have been timely considered by the Agencies (and is not properly part of the record). However, the Agencies explained that they *did* consider the SAB's draft commentary, and that its relevant comments "were also raised by public commenters throughout the rulemaking process, and as a result, have been addressed" in the NWPR. 85 Fed. Reg. at 22,261.

other climatic variables for a particular geographic region. *E.g.*, *id.* at 22,288. The Agencies are relying on science to develop implementation tools and scientific-based approaches to identify flow classification and typical year conditions. *Id.* Contrary to Colorado's claims, the NWPR is fully informed by science and appropriately considered the Connectivity Report. *Id.* at 22,271, 22,288.

Colorado suggests that the presence of any scientific connection between upstream ephemeral waters, or nonadjacent wetlands, makes the Agencies' interpretation excluding them arbitrary and capricious. Mot. at 16. This is legally and scientifically wrong. Preliminarily, this is certainly not what Colorado itself said when securing a preliminary injunction against the 2015 Rule. *North Dakota*, No. 3:15-cv-59, Dkt. No. 33 at 16 (Aug. 10, 2015) (arguing the tributary definition in the 2015 Rule was unlawful because it covered a water "regardless of whether its contribution of flow [to a traditional navigable water] is direct or measurable"). Regardless, as the Agencies acknowledged ***back in 2015***, science alone cannot dictate the line between federal and state waters. 80 Fed. Reg. at 37,055. In fact, even the 2015 Rule "interpretation [wa]s based not only on legal precedent and the best available peer-reviewed science, but also on the agencies' technical expertise and extensive experience in implementing the CWA over the past four decades." *Id.* And EPA's SAB similarly stressed in 2015: "'significant nexus' is a legal term, not a scientific one." *Id.* at 37,065. The Agencies found that "science does not provide a precise point along the continuum at which waters provide only speculative or insubstantial functions to downstream waters." *Id.* at 37,090. So the science of the 2015 Rule has not been "ignored." Those findings—and the presence of some scientific "connectivity" between waters—simply can't unilaterally answer the legal question of the scope of the CWA. Colorado knows this. It challenged

the 2015 Rule for failing to recognize the statutory limits and states' rights, and the rule's scientific basis for covering some waters. *North Dakota*, No. 3:15-cv-59, Dkt. Nos. 212 at 33 & 33 at 16.

For the NWPR, the Agencies reiterated that they again balanced many factors to inform where to draw the line of federal jurisdiction, including science, consistent with the CWA's text and structure. *E.g.*, *id*. at 22,283-89. The Agencies also considered what would provide for clarity, fair and predictable limits of jurisdiction, and efficient administration, and respect for state authority, *see, e.g.*, *id.* at 22,270; RTC: Legal Arguments at 64-68, 114-15.

As Colorado itself previously said is necessary (and case law requires), the NWPR draws certain lines leaving some scientifically connectable waters beyond CWA jurisdiction. *See id.* at 22,262-71 (discussing *SWANCC* and *Rapanos*). This is completely reasonable. "[B]right-line tests are a fact of regulatory life," and agencies may "sacrifice some case-by-case precision in favor of a regime that is relatively easy to administer and promotes nationwide uniformity." *Macon Cty. Samaritan Mem'l Hosp. v. Shalala*, 7 F.3d 762, 768-69 (8th Cir. 1993). Colorado's pretension that science was simply ignored is refuted by the record.

### 3.    The Agencies Did Not Rely on the Economic Analysis or the Resource and Programmatic Assessment as a Basis for the Rule.

Contrary to Colorado's contention, the Agencies did not rely on the EA or RPA to inform the definition of "waters of the United States." Although the Agencies developed those analyses to evaluate the Rule's effects on economic impacts and changes in state and tribal regulatory programs, such potential impacts were not a basis for the NWPR. 85 Fed. Reg. at 22,332, 22,335. A cost-benefit analysis conducted under E.O. 12866 and E.O. 13563 is intended only for internal purposes and is not subject to judicial review. E.O. 12866 § 10; E.O. 13563 § 7(d). Similarly, a Regulatory Flexibility Act analysis is intended solely to determine whether certain small-business-

related procedural requirements attach to rulemakings. Outside of this limited small business context, unless an agency's economic analysis is a basis for its rule, such analysis is not subject to judicial review. *See, e.g.*, *Allied Local & Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 78-81 (D.C. Cir. 2000); *see also Western Wood Preservers v. McHugh*, 925 F. Supp. 2d 63, 75-76 (D.D.C. 2013). Here it was not. 85 Fed. Reg. at 22,335. Thus, even if the Agencies inaccurately or incompletely analyzed the impacts, it would not render the Rule unreasonable.

### 4. Colorado Had Ample Opportunity to Comment on "Typical Year."

Colorado claims that it was not given a sufficient opportunity to comment on the way the Agencies would determine a "typical year," or how the Agencies would evaluate whether intermittent streams contribute flow to traditional navigable waters. Mot. at 20. But the Agencies provided a 60-day comment period, and received approximately 620,000 comments. *See* 85 Fed. Reg. at 22,261. The Agencies also conducted four in-person meetings with state regulators and held a public hearing where state regulators participated. *Id.* And Colorado acknowledges that it submitted a comment letter during the public notice period. Mot. at 4; *see also* Dkt. No. 24-3. Case law establishes that this is more than sufficient process. *Am. Min. Cong. v. Marshall*, 671 F.2d 1251, 1261 (10th Cir. 1982) (holding the agency satisfied the APA's public notice requirement when it provided a 30-day public comment period). The Agencies easily satisfied the APA requirements to provide reasonable notice and opportunity to comment.

Moreover, Colorado's claim that it lacked an opportunity to comment because the proposal did not explain or provide adequate resources to determine "typical year" or identify "intermittent" streams is without merit. The proposal clearly articulated the Agencies' proposed methodology in determining "typical year." *See* 84 Fed. Reg. 4154, 4177 (Feb. 14, 2019) (considering a year

"typical" when "observed rainfall from the previous three months falls within the 30th and 70th percentiles" for totals over the preceding 30 years). The Agencies' proposal further identified a number of accepted procedures that could be used to determine whether a stream has intermittent flow and if it contributes surface flow to traditional navigable waters. *Id.* at 4,176-77. In sum, Colorado's claim that it did not have a meaningful opportunity to comment is unavailing.

## C.     The Agencies Did Not Violate the National Environmental Policy Act.

The CWA expressly exempts the Rule from NEPA's requirements. Generally, "no action of the [EPA] Administrator taken pursuant to [the CWA] shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of [NEPA]." 33 U.S.C. § 1371(c)(1). This statutory exemption applies even though EPA jointly promulgated the NWPR with the Army. On its face, the CWA exemption is not limited to actions taken by EPA alone. "That [a CWA] Rule was promulgated jointly by the EPA Administrator *and* the Secretary of the Army does not defeat the fact that it represents action, in substantial part, of the Administrator." *In re U.S. Dep't of Def.*, 817 F.3d 261, 273 (6th Cir. 2016) *rev'd on other grounds sub nom. Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018); *see also Municipality of Anchorage v. United States*, 980 F.2d 1320, 1328-29 (9th Cir. 1992) (same).

The Rule broadly concerns the jurisdictional scope of the entire Act, including the myriad CWA programs administered only by EPA. *See* 80 Fed. Reg. 37,054. Notably, EPA only *shares* its CWA permitting authority with the Army in only *one* section—section 404, 33 U.S.C. § 1344. And EPA has the ultimate authority to determine the scope of CWA jurisdiction. *See* 43 Op. Att'y Gen. 197, 1979 WL 16529 (U.S.A.G. Sept. 5, 1979); 80 Fed. Reg. at 37,055 (describing at least six exclusively EPA programs in which the term "waters of the United States" is used). The Rule

is therefore—for NEPA—an "action of the Administrator" subject to the statutory exemption, notwithstanding the Army's joint participation. *In re U.S. Dep't of Def.*, 817 F.3d at 273. As such, the Agencies were not required to prepare a NEPA analysis.

In any event, the Rule simply reflects the Agencies' construction of the statutory text and limits to their statutory jurisdiction and thus does not trigger NEPA. *See Ctr. for Food Safety v. Vilsack*, 718 F.3d 829, 842 (9th Cir. 2013) (concluding that agency had no duty under NEPA to analyze alternatives outside its statutory jurisdiction, as interpreted by the agency); *see also DOT v. Public Citizen*, 541 U.S. 752, 766 (2004) (concluding that agency had no discretion and thus no NEPA analysis was required). And any impacts to jurisdictional or non-jurisdictional waters would flow from future actions that will either have their own NEPA analysis or are not subject to NEPA.

## II.    Colorado Has Failed to Meet Its Burden of Showing Irreparable Harm.

Colorado's purported irreparable harm stems from a supposed inability to "[a]dminister the permit system [for dredge and fill material] as provided in [its state statute]." Colo. Rev. Stat. § 25-8-302(1)(b). Failure to be able to meet this self-imposed obligation—based on state law passed *decades ago* in light of a proposal made in 2018, and posted in final form *for months* now—does not establish imminent injury caused by the NWPR. To the contrary, this actually supports the NWPR's findings, that many states already have adequate state authority to address any "harm" to waters that may be excluded from federal jurisdiction. However, Colorado's desire to continue to rely *exclusively* on federal permitting for certain waters, when it has adequate authority and years of notice of an impending regulatory change, does not rise to the level of an irreparable harm.

### A.     Colorado's Alleged Harms Are Not Legally Cognizable.

Colorado inconsistently argues that an alleged "permitting gap" will both cause environmental harm, and yet preclude infrastructure development requiring the filling of wetlands and waters. Neither of these superficially articulated theories of harm withstand legal scrutiny.

*First*, Colorado fails to acknowledge that any "permitting gap" between federal and state laws means that ***any*** waters in the gap ***will be presumptively protected*** unless Colorado decides to permit their filling. So none of the environmental harm that Colorado posits can legally occur as a result of the NWPR. Colorado's "state waters" are defined more broadly than "waters of the United States," and include "any and all surface and subsurface waters which are contained in or flow in or through" the state. *See* Colo. Rev. Stat. § 25-8-103(19).[3] State law provides that *no* discharges are allowed, unless and until authorized by a state or federal permit. Colo. Rev. Stat. § 25-8-501(1).

Once the NWPR is in effect, Colorado does not dispute that it can and will continue to grant permits to discharge pollutants regulated under the CWA section 402 program, which Colorado administers. Colorado's complaint is that, in the absence of a state program for discharges of dredged or fill materials, wetlands and waters will be filled. This is nonsense. Its state law will continue to bar the environmental injuries it speculates, regardless of the scope of the CWA. And a hypothetical increase in unlawful discharges by third parties as a result of the NWPR is totally speculative. Where "injury . . . hinges on actions taken by [third parties], [Colorado] carr[ies] 'the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury.'"

---

[3] At the very least, after *Rapanos* was issued in 2006, though likely even before then, the Agencies did *not* assert their jurisdiction as broadly as Colorado. *See generally* Dkt. No. 24-1.

*Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011) (citation omitted) (discussing injury for purposes of standing). So courts "have rejected assertions of imminent injury where the prospective injury depends on future illegal activity." *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 831 (D.C. Cir. 2016).

*Second*, Colorado then contradicts its speculative environmental harm by suggesting the problem instead is that state infrastructure projects will grind to a halt. It ironically complains that businesses and developers will be delayed getting permits to dredge and fill ephemeral waters and nonadjacent wetlands no longer *requiring* section 404 permits *at all*. Mot. at 7. To the extent there may be theoretical delays for Colorado businesses from a state-law prohibition on "building new developments," Colorado does not have standing to assert such injuries. It cannot claim them as irreparable harm to the State for purposes of an injunction. "A State does not have standing as *parens patriae* to [sue] the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982).

Moreover, Colorado cannot establish the predicate for emergency injunctive relief when its state law has prohibited such discharges *for decades*. The State has elected not to establish its own permitting program (even for the broader category of "state waters" that were always beyond CWA jurisdiction). And Colorado has long been on notice, *see supra* Argument Part I.B.1, that the Agencies intended to "'rescind and revise' the definition of 'waters of the United States.'" RTC: Legal Arguments at 29. Although—with a decade-plus of general notice, and a year's notice of the Agencies' proposed and then final NWPR—Colorado may not be able to implement a state permitting system like that of the Corps before June 22, 2020, that does not now qualify it for injunctive relief. Colorado's "unclean hands" from unreasonably delayed preparation for a revised

CWA definition precludes the state from obtaining preliminary, equitable relief. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (finding no injury where state's alleged harm was "self-inflicted, resulting from decisions by [its] legislature[]").

Instead, it is Colorado law—not the NWPR—that is the proximate cause of the alleged "harm" from state waters being so protected that infrastructure projects might be delayed. *Accord Bennett v. Spear*, 520 U.S. 154, 167 (1997) (injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"); *see also Duquesne Light Co. v. EPA*, 166 F.3d 609, 613 (3d Cir. 1999) (finding no causation where Pennsylvania's state law action increased environmental regulations "beyond the minimum level of stringency required by federal law"). And Colorado can duly change or modify those state laws to permit wetland filling for development. But its "[p]urely speculative harm will not suffice" to receive injunctive relief pending orderly proceedings on the merits at summary judgment. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

**B.     Colorado's Insufficient Evidence Does Not Support Its Speculative Harm.**

Even if the Court entertained the speculative notion that "illegal dredge and fill projects" will cause Colorado harm, Mot. at 9, there is simply no evidentiary basis for it. Colorado must show *imminent*, *permanent* harm from such projects—which would occur before a disposition of the merits—to obtain a preliminary injunction. *N.M. Dep't of Game & Fish*, 854 F.3d at 1253. Yet nothing before this Court (1) identifies any specific discharges that will occur as a result of the NWPR,[4] (2) describes how those specific discharges will imminently cause Colorado actual

---

[4] Without identifying specific discharges, it is impossible to tell whether any injury flowing from those discharges would result from the NWPR or would have happened anyway under the current regulatory regime that allows discharges under CWA sections 402 and 404.

environmental injury, or (3) informs how those injuries will occur prior to this Court's ability to adjudicate the merits of Colorado's claims. Without presenting evidence on each of these three steps, Colorado cannot meet its high bar. *See RoDa Drilling*, 552 F.3d at 1210.

Instead, Colorado has presented nothing more than unfounded conjecture. For instance, the Rowan Declaration states only that "[i]f the 2020 Rule goes into effect, none of these activities could be permitted in Colorado's non-federal waters at this time, resulting in either cancelled and delayed projects or potential illegal fill activity." Rowan Decl. ¶ 13; *see also id.* ¶ 15 ("we expect much illegal activity to be reported"). Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." But Rowan fails to set forth foundation for her statements on imminent "illegal fill activity." The Declaration has no facts establishing firsthand knowledge of such activity. It simply has not established that any such activity would imminently occur—and injure Colorado *as a state* rather than Coloradans *parens patriae*.

By failing to point to any specific illegal discharges—and explain how they would cause injury to Colorado *qua* the State of Colorado—this Court is unable to address the *Winter* factors or comply with Federal Rule 65's "Contents" requirements to issue an injunction. Fed. R. Civ. P. 65(d). Indeed, *Utahns for Better Transp. v. DOT*, No. 01-4216, 2001 WL 1739458 (10th Cir. Nov. 16, 2001), cited by Colorado, shows the sort of specific allegations that can demonstrate irreparable harm—yet are obviously lacking here. There, a highway project allegedly "cause[d] a direct loss of approximately 114 acres of wetlands on the eastern perimeter of the Great Salt Lake, with indirect impacts over a larger area." *Id.* at *1. Here, however, Colorado identifies no *specific* at-risk waters. It merely states some wetlands and ephemeral streams would lose federal protection

and that such waters serve important ecological functions—though they are protected, still, by Colorado state law. *See, e.g.*, Klein Decl. ¶¶ 12-14; Bachmann Decl. ¶¶ 5-7. Nor, unlike *Utahns for Better Transp.*, are there specific infrastructure projects identified. More critically, there are none identified whose scope includes ephemeral or isolated wetlands that *might* have been covered by a section 404 permit, but are now clearly excluded from a need for such a permit. So Colorado fails to "demonstrate that in the absence of a preliminary injunction, '[it] is likely to suffer irreparable harm *before a decision on the merits can be rendered.*'" *Winter*, 555 U.S. at 22 (emphasis added). Because there is no evidence that the merits cannot be resolved at summary judgment before the speculated harms of Colorado might become permanent, "there is no need for interlocutory relief." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003).

## III.    The Public Interest and the Balance of Harms Weighs in the Agencies' Favor.

The "balance of harms" and "public interest" prongs, which merge when the government is the opposing party, *Nken v. Holder*, 556 U.S. 418, 435 (2009), also favor the Agencies and weigh against an injunction. If Colorado were to succeed in obtaining the requested preliminary injunction, different regulatory definitions would apply in Colorado than in the rest of the country. This would create uncertainty and confusion, hampering the Agencies' ability to efficiently perform regulatory functions. This is also problematic for regulated persons operating in multiple states—thereby frustrating a key objective of federal regulation. And the public has an interest in the NWPR's clearer jurisdictional lines and better balancing of factors than decades-old regulation. Indeed, courts recognize the "public interest" in the efficient administration of laws. And they refuse injunctive relief that would undermine such public interest. *See, e.g.*, *Sierra Club v. Corps*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013) (finding "the public has an interest in regulatory efficiency"

that comes with a uniform CWA permitting system, which could be undermined by a preliminary injunction); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1281-82 (9th Cir. 2020) (recognizing the "compelling interest in ensuring that injunctions . . . do not undermine separation of powers" and the Executive's ability to administer its laws). Accordingly, the public interest in an efficient and uniform administration of this policy outweighs Colorado's speculative harms.

As to the scope of any injunctive relief, Colorado does not request a nationwide injunction, nor would such relief be appropriate. *See, e.g.*, *City & Cty. of San Fran. v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (vacating nationwide injunction because record did not support its scope); *see also California v. Wheeler*, No. 3:20-cv-3005, Dkt. No. 107 (N.D. Cal. June 1, 2020) (23 proposed defendant-intervenor states *supporting* the NWPR). An injunction must be no more extensive than necessary to provide complete relief to a plaintiff. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995). So, "[i]f a less drastic remedy" is "sufficient to redress [Colorado's] injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto Co. v Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Here, no injunctive relief is warranted. But any injunctive relief would have to be specifically tailored. It would have to be limited to the State of Colorado and addressing *only* the *specific* regulatory provisions purportedly creating imminent, irreparable harm that is sufficiently proven by a declarant (*e.g.*, harm to a specific waterbody or specific regulatory, proprietary, or economic interest)—though there are none.

## CONCLUSION

For the reasons set forth above, Colorado's amended motion should be denied.

DATED at Denver, Colorado this 8th day of June 2020.

Respectfully submitted,

JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

s/ Sonya J. Shea
**Sonya J. Shea**
**Phillip R. Dupré**
**Devon Lehman McCune**
U.S. Department of Justice
Environment & Natural Resources Division
999 18th Street – South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-7231 (Shea)
Telephone: (202) 616-7501 (Dupré)
Telephone: (303) 844-1487 (McCune)
Email: sonya.shea@usdoj.gov
Email: phillip.r.dupre@usdoj.gov
Email: Devon.McCune@usdoj.gov
Attorneys for Defendants


Of Counsel:

**Matthew Z. Leopold**
General Counsel
**David Fotouhi**
Principal Deputy General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Carrie.Noteboom@coag.gov
Eric.Olson@coag.gov
Jennifer.Hunt@coag.gov
Annette.Quill@coag.gov
Laurie.Merrick@coag.gov
laura.kelly@coag.gov
john.watson@coag.gov
barbara.boyd@coag.gov
quill.annette@gmail.com
Afrancois@pacificlegal.org
IncomingLit@pacificlegal.org
Blegner@mayerbrown.com
Ccampbell@mayerbrown.com
Tbishop@mayerbrown.com
courtnotification@mayerbrown.com
7767409420@filings.docketbird.com
wdc.docket@mayerbrown.com

I hereby certify that I have mailed or served the foregoing document or paper to the following non-CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

N/A

_s/ Sonya J. Shea_
**Sonya J. Shea**
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
999 18th Street – South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-7231
Email: sonya.shea@usdoj.gov
Attorney for Defendants