**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-1461-WJM-NRN

THE STATE OF COLORADO,

    Plaintiff,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental
Protection Agency;
U.S. ARMY CORPS OF ENGINEERS; and
R.D. JAMES, in his official capacity as Assistant Secretary of the Army for Civil Works,

    Defendants.

---

## ORDER GRANTING AS-CONSTRUED MOTION FOR STAY OF AGENCY ACTION

---

Plaintiff State of Colorado ("Colorado") sues the U.S. Environmental Protection Agency ("EPA") and its administrator, along with the U.S. Army Corps of Engineers ("Corps of Engineers") and its administrator, to invalidate a new regulation regarding the scope of federal jurisdiction under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* The Court will refer to Defendants collectively as "the Agencies."

Currently before the Court is Colorado's Amended Motion for Preliminary Injunction. (ECF No. 24.) The Court construes this as a motion seeking a stay of agency action under 5 U.S.C. § 705. For the reasons explained below, the Court finds that Colorado advances an unusual and partly self-contradictory theory of harm, but Colorado has nonetheless satisfied the elements required to obtain preliminary relief. The Court will therefore enjoin the Agencies from implementing their new regulation in

Colorado.[1]

## I.  LEGAL STANDARD

Colorado explicitly moves for a preliminary injunction under Federal Rule of Civil

Procedure 65.  (*See* ECF No. 24 at 2.)[2]  Because this case seeks review of agency

action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, the

proper authority for preliminary relief is 5 U.S.C. § 705:

> When an agency finds that justice so requires, it may
> postpone the effective date of action taken by it, pending
> judicial review.  On such conditions as may be required and
> to the extent necessary to prevent irreparable injury, the
> reviewing court . . . may issue all necessary and appropriate
> process to postpone the effective date of an agency action
> or to preserve status or rights pending conclusion of the
> review proceedings.

But the distinction between Rule 65 and § 705 is mostly technical because a § 705 stay

is a provisional remedy in the nature of a preliminary injunction, *see Winkler v. Andrus*,

614 F.2d 707, 709 (10th Cir. 1980), and its availability turns on the same four factors

considered under a traditional Rule 65 analysis, *see, e.g.*, *Hill Dermaceuticals, Inc. v.*

*U.S. Food & Drug Admin.*, 524 F. Supp. 2d 5, 8 (D.D.C. 2007).[3]

---

[1] Through the Agencies' notice of supplemental authority filed a little over an hour ago (ECF No. 60), the Court has been made aware of a decision earlier today from the United States District Court for the Northern District of California denying a preliminary injunction against the new regulation at issue here.  *See State of California et al. v. Wheeler*, No. 20-cv-3005 (N.D. Cal.), ECF No. 171 (filed June 19, 2020) (on this docket as ECF No. 60-1) (hereinafter, "*State of California*").  The Court explains its disagreements with *State of California* below.

[2] All citations to ECF page numbers are to the page number in the CM/ECF header, which does not always match the document's internal pagination due to unnumbered caption pages and separately numbered prefatory material (such as tables of contents).

[3] The major practical difference, it appears, between a Rule 65 proceeding and a § 705 proceeding is that Rule 65(c) requires a court granting an injunction to consider a bond amount, whereas § 705 contains no such requirement.

The Supreme Court has described the four preliminary injunction factors as follows: "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## II.  STATUTORY BACKGROUND & PROCEDURAL HISTORY

Absent a permit, the CWA prohibits "discharge of any pollutant," 33 U.S.C. § 1311, into "navigable waters," *id.* § 1362(12).  "Navigable waters" means "the waters of the United States."  *Id.* § 1362(7).  The CWA does not further define "waters of the United States," so the Agencies have defined it by regulation.  *See* 33 C.F.R. § 328.3. The current definition reaches more than literally "navigable" waters, but the precise details are unimportant for present purposes.  What matters is that, on June 22, 2020, the Agencies will put into effect a new rule that narrows the current definition of that term.  *See* 85 Fed. Reg. 22250 (Apr. 21, 2020).  In other words, the new rule puts some waters outside the reach of the CWA that the Agencies previously considered to be within the reach of the CWA.  The Court will refer to the rule in effect today as the "Current Rule," the rule to take effect this coming Monday as the "New Rule," and the waters that are encompassed by the Current Rule but not by the New Rule as "Disputed Waters."

Of particular importance in this regard is the "Section 404 permit" process, which refers to the Corps of Engineers' authority under CWA § 404 (33 U.S.C. § 1344) to "issue permits . . . for the discharge of dredged or fill material into the navigable waters." *Id.* § 1344(a).  Thus, for instance, if a developer wants to fill in a marshy area so it may

build on it, and if that marshy area is deemed "navigable waters"—*i.e.*, "waters of the United States" as defined in 33 C.F.R. § 328.3—then the developer must first obtain a Section 404 permit from the Corps of Engineers.  On the flipside, if the marshy area is not "waters of the United States" as defined in 33 C.F.R. § 328.3, then the developer does not need a Section 404 permit—meaning, from the perspective of federal law, the developer may fill in the marshy area with impunity.  If the New Rule goes into effect, such a developer would no longer need a Section 404 permit to fill Disputed Waters.

But whether federal law requires a permit or not, a state may enforce its own standards that are stricter than Section 404.  *See* 33 U.S.C. § 1344(t) ("Nothing in this section shall preclude or deny the right of any State . . . to control the discharge of dredged or fill material in any portion of the navigable waters within the jurisdiction of such State . . . .").  Colorado asserts jurisdiction over "state waters," defined to mean (with exceptions not relevant here) "any and all surface and subsurface waters which are contained in or flow in or through this state."  Colo. Rev. Stat. § 25-8-103(19).  And "[n]o person shall discharge any pollutant into any state water from a point source without first having obtained a permit from the division [*i.e.*, the Water Quality Control Division of the Colorado Department of Public Health and Environment]."  Colo. Rev. Stat. § 25-8-501(1).

The parties do not dispute that Colorado's definition of "state waters" embraces the Disputed Waters.  Thus, anyone seeking to fill Disputed Waters will still need a permit from the state when the New Rule goes into effect.  However, under Colorado law, "[n]o permit shall be issued which allows a discharge that by itself or in combination with other pollution will result in pollution of the receiving waters in excess of the

pollution permitted by an applicable water quality standard unless the permit contains effluent limitations and a schedule of compliance specifying treatment requirements." Colo. Rev. Stat. § 25-8-503(4).  This presents a problem for Colorado: "Because discharges of large quantities of fill, by their nature, are likely to result in exceedances of state water quality standards and compromise the classified uses of these waters, the [state] could not allow almost any of them under a state discharge permit."  (ECF No. 24 at 8.)  In other words, there is no state water quality standard that contemplates dumping dirt and rock into water until it becomes dry land.  Thus, filling state waters is flatly prohibited under Colorado law.

Since roughly January of this year, in anticipation of the New Rule, state administrators have been working with the Colorado Legislature to amend the relevant statute to provide state authority equivalent to Section 404.  (ECF No. 56 ¶ 2.)  These efforts, like many other things, were disrupted by the COVID-19 pandemic.  (*Id.* ¶ 3.) The legislature adjourned on June 15, 2020, without passing legislation that would provide Section 404-like authority to state administrators.

The Court will provide additional background as it becomes relevant to the legal issues addressed below.

### III. ANALYSIS

**A.     Irreparable Harm**

Among the preliminary injunction factors, "a showing of probable irreparable harm is the single most important prerequisite."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).  "Without showing irreparable harm, [a party] cannot obtain a preliminary injunction."  *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1143 (10th Cir.

2017).  "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original; internal quotation marks omitted).  "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise."  *Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003).  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."  *Schrier v. University of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005).  Harm that is "merely serious or substantial" is not irreparable.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

In this case, the irreparable harm inquiry overlaps with whether Colorado asserts *any* cognizable harm flowing from the New Rule.  If it does not, this Court does not have jurisdiction under Article III of the U.S. Constitution to adjudicate the dispute.  In other words, every plaintiff in federal court must have "Article III standing," which entails the following:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of . . . .  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated).  "Article III standing is jurisdictional . . . ."  *In re Peeples*, 880 F.3d 1207, 1212 (10th Cir. 2018).

Given the significance of irreparable harm in light of Article III standing, the Court

6

will address it before reaching the other preliminary injunction elements.

1.      The "Permitting Gap" and Foregone Development

Colorado first asserts harm from what it calls the "permitting gap." (ECF No. 24 at 7.) The basic problem, Colorado says, is that Disputed Waters are still protected under state law (because they are "state waters") but Colorado's flat prohibition on filling state waters means that "project sponsors [*e.g.*, developers] will be left without any legal mechanism to authorize projects that require discharges of fill in these waters." (*Id.* at 8.)

It would seem that project sponsors were without such a legal mechanism—at least from the perspective of state law—even under the Current Rule, because Colorado simply prohibits fill. In other words, a developer discharging fill per a Section 404 permit would still appear to be violating state law, whether or not Colorado chose to enforce that law. However, Colorado's clean water statute further provides that "each permit issued pursuant to the federal act shall be deemed to be a temporary permit issued under this article which shall expire upon expiration of the federal permit." Colo. Rev. Stat. § 25-8-501(1). Thus, federal permits are essential to Colorado's ability to overcome its own ban on dredging and filling.

In light of the permitting gap, Colorado asserts that developers will not develop projects because Colorado cannot authorize their dredge and fill operations. From a preliminary injunction perspective, Colorado has provided no evidence of any such project, much less a project poised to start—in other words, one that needs a permit to fill Disputed Waters "before a decision on the merits [of this lawsuit] can be rendered,"

*Winter*, 555 U.S. at 22 (internal quotation marks omitted).[4]  "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* (emphasis added).

But the problem is deeper than simple failure to provide the evidence needed to support a preliminary injunction.  Colorado's inability to authorize these projects is the result of nothing other than Colorado's choice in the matter.  If such projects never get built, leading to economic harm, it is because the Colorado Legislature made the questionable decision to enact a clean water statute that provides no exception for filling.  Colorado has thus categorically prioritized environmental preservation over economic gain—a prioritization in which the Agencies had no role in effecting.  Projects not built under these circumstances would therefore be consistent with state policy, a policy wholly independent of the federal environmental policies codified in the CWA.  The Court simply cannot see how adherence to state policy is an injury to the state, much less one caused by the New Rule.  *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries [complained of by the state-plaintiffs] were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand.").

Even if Colorado could assert the economic harm to developers as an injury to itself, Colorado may not sue the federal government to vindicate the federal rights (in this case, rights created by the APA and CWA) of its citizens (here, most notably,

---

[4] Obviously, if a developer plans to fill waters that remain "waters of the United States" under the New Rule, the developer can go to the Corps of Engineers for a Section 404 permit.

private developers).  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458

U.S. 592, 610 n.16 (1982); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923);

*State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).  The Agencies point

out as much in their response brief (*see* ECF No. 51 at 26), and Colorado's reply brief

does not directly address the argument.  It appears, rather, to address the argument

indirectly by emphasizing "a project to improve safety on a state highway in Clear Creek

County" (ECF No. 55 at 4)—in other words, something that Colorado itself (not any

private developer) will forgo, and therefore outside the rule that a state may not assert

its citizens' federal rights against the federal government.

      The Clear Creek County project to which Colorado alludes is a plan to repair part

of the famous—and famously rough—State Highway 5, which leads nearly to the

summit of Mt. Evans.  (*See* ECF No. 31 ¶¶ 20–28.)  A 0.7-mile segment of the highway

near Summit Lake is "heavily-damaged" due to frost heave.  (*Id.* ¶¶ 21–22.)  In part, this

is because the road is surfaced with an impermeable material, which buckles when

underlying groundwater freezes and thaws.  (*Id.*)  Colorado proposes to replace the

road base with crushed rock, allowing the groundwater to freeze and thaw without

displacing the road.  (*Id.* ¶ 24.)  According to Colorado, this will require some amount of

filling in wetlands, including an approximately 1/3-acre that will become Disputed

Waters under the New Rule, and therefore outside of the Section 404 permitting

process.  (*Id.* ¶ 26.)  And, Colorado says, there is "[n]o alternative to reconstruction on

the existing alignment," due to "steep conditions, land ownership, and lack of right-of-

way . . . .  Without a federal permitting mechanism to authorize discharge of fill into

wetlands, the project could not move forward."  (*Id.* ¶ 27.)

Assuming the truth of these assertions, and further assuming that inability to repair a routinely damaged but operational road segment is irreparable harm, Colorado's allegations are insufficient to show "imminent" irreparable harm.  *See Heideman*, 348 F.3d at 1190.  Colorado submits no evidence that it is prepared to begin reconstruction but for a permit, or that it will be prepared "before a decision on the merits [of this lawsuit] can be rendered."  *Winter*, 555 U.S. at 22 (internal quotation marks omitted).  To the contrary, Colorado says that "[a]n impact assessment has not been completed yet" on "the proposed project."  (ECF No. 31 ¶ 25.)  This strongly suggests that this particular highway repair project remains very much in the planning stages.[5]

But again, more fundamentally, the real problem is that Colorado has prohibited itself from filling "state waters," and it is apparently poised to enforce that prohibition against itself.  That self-inflicted injury is manifestly not an injury caused by the New Rule.

### 2.    Direct Environmental Harm

Colorado further claims that the New Rule will cause direct environmental harm because developers may begin filling Disputed Waters, in violation of state law.  (ECF No. 24 at 9.)  Notably, Colorado does not express any fear about rogue developers generally (at least not in its opening brief—but see below), probably because Colorado appreciates that a developer willing to take its chances without a state permit is

---

[5] It is also "generally known within [this] court's territorial jurisdiction," Fed. R. Evid. 201(b)(1), that State Highway 5 is open to the public usually only from Memorial Day to Labor Day, due to the highly inclement weather at such high elevation.  Even if the construction-access season is longer than the public-access season, it cannot be much longer, and Colorado has submitted no evidence that it is prepared to begin construction before it must completely close the road for the winter season.

probably equally willing to take its chances without a Section 404 permit, whatever the scope of "waters of the United States."  In other words, rogue developers operate unlawfully today under the Current Rule, and will continue to operate unlawfully under the New Rule, so the harm they cause cannot be attributed to or caused by the New Rule.

Colorado instead posits a very specific problem relating to developers "who previously sought federal permits."  (ECF No. 24 at 9.)  "[I]t is likely," Colorado says, "that some [of these] developers . . . may believe they are no longer subject to any regulatory oversight and will move forward with dredge and fill activities in [Disputed Waters] without taking the needed steps to protect downstream waters and mitigate any remaining environmental harm."  (*Id.* at 9–10.)

Colorado certainly has an interest in protecting state waters, and that interest is cognizable for purposes of standing and irreparable harm when "the harm is sufficiently concrete."  *See New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 697 n.13 (10th Cir. 2009) (summarizing *Massachusetts v. EPA*, 549 U.S. 497, 522–23 (2007)).  However, Colorado's alleged chain of causation between the New Rule and the damage to state waters is pure speculation.  Colorado offers no evidence in support of its contention that it is "likely" that a previously-permitted developer (one who has so far sought to obey the law) would conclude that the narrowing of one law means there must be no more laws to comply with.  This is nothing more than attorney argument.

Even as attorney argument, the theory runs into a doubly strong headwind because it relies on (1) the actions of third parties and (2) the prediction that someone will disobey the law.  *See, e.g.*, *Chamber of Commerce v. EPA*, 642 F.3d 192, 200–01

(D.C. Cir. 2011) (if injury will be caused by a third party, claimant has "the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury" (internal quotation marks omitted; alterations incorporated)); *R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 831 (D.C. Cir. 2016) ("We have rejected assertions of imminent injury where the prospective injury depends on future illegal activity, finding, for example, that a sheriff lacked standing to challenge President Obama's immigration policy partly because the plaintiff's theory depended on immigrants' committing crimes in the future.  More generally, we are relatively hesitant to find standing when the asserted injury depends on the unfettered choices made by independent actors not before the courts." (internal quotation marks and citation omitted)); *cf. Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1216 (10th Cir. 2015) (finding a challenge to prison regulations moot because, in part, "we decline to assume [the plaintiff] will repeat the misconduct that previously got him sent to administrative segregation").

A declaration from one of Colorado's water quality administrators asserts that the "EPA has historically completed between three and five enforcement cases in Colorado per year for 404 permit violations."  (ECF No. 32 ¶ 15.)  A declaration from a retired EPA employee describes an unpermitted fill that took place in Telluride "[i]n the late 1980s."  (ECF No. 28 ¶ 21.)  Colorado cites these declarations in its reply brief as "evidence that illegal fill activity occurs in the state."  (ECF No. 55 at 4.)  Indeed, it shows that illegal fill has happened *under the Current Rule*.  Or, as the Court observed above, rogue developers will operate outside the law, whatever rule the Agencies adopt.  The New Rule therefore does not cause illegal fill, nor has Colorado presented any evidence that

the New Rule will make illegal fill more likely.  Nonetheless, this record of violation

remains important below as part of a different standing theory.

3.    Injury Through Costs of Creating and Running a Replacement Permitting
      Regime

Colorado claims that if the New Rule is not enjoined, it will eventually spend

money to set up and administer its own 404-like permitting and enforcement regime,

and the resources it expends in those efforts will ultimately be unrecoverable, even if it

prevails in this lawsuit.  (ECF No. 24 at 7, 9.)  Colorado is correct that it cannot obtain

damages from the Agencies, even if it eventually succeeds in invalidating the New Rule.

*See* 5 U.S.C. § 702 (APA waives sovereign immunity only for actions "seeking relief

other than money damages").  And courts have recognized that a plaintiff suffers

irreparable harm if the defendant's action causes the plaintiff to spend, or deprives the

plaintiff from earning, money that the plaintiff can never recover due to sovereign

immunity, even if the plaintiff succeeds in proving the defendant's conduct unlawful.

*See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d

1536, 1543 (10th Cir. 1994); *Cloud Peak Energy Inc. v. U.S. Dep't of Interior*, 415 F.

Supp. 3d 1034, 1042–43 (D. Wyo. 2019).

One might argue that nothing about the New Rule forces Colorado to establish a

state-law analogue to Section 404, so this alleged injury is not caused by the New Rule.

The Court will pick up this argument again shortly in a context where it actually matters.

In the current context, the problem for Colorado is more practical.  Colorado admits that

it will not spend any money to set up a Section 404-like permitting and enforcement

regime until the Colorado Legislature amends Colorado's water quality statute to permit

dredging and filling.  (ECF No. 24 at 9 ("Colorado cannot simply start issuing dredge

and fill permits on June 22.  Establishing its own permitting program for dredge and fill activities *will require legislative action* and a lengthy implementation process." (emphasis added)).  And, as noted above (Part II), the Colorado Legislature adjourned for the year on June 15, 2020, without creating a Section 404 analogue.  Colorado therefore will not be spending money anytime soon on a new permitting and enforcement regime.

### 4.  Enforcement of the Current Statute

Colorado says that it "will need to and will take enforcement action against illegal fill activity in state waters"—meaning *all* fill activity in state waters—when the New Rule comes into effect.  (ECF No. 32 ¶ 15.)  Colorado admits that "nothing compels [it] to begin enforcing against non-permitted discharges after the [New] Rule goes into effect," but it asserts that it "cannot exercise its enforcement discretion in response to the sudden narrowing of the federal Section 404 permitting process without creating significant harm to Colorado's environment."  (ECF No. 58 at 6.)  Moreover, Colorado's water quality enforcers "do[] not currently have dedicated funding or staffing resources to undertake this enforcement effort, so [they] will need to pull enforcement resources currently dedicated to other clean water activities."  (ECF No. 32 ¶ 15.)  The question for present purposes is whether this is a cognizable Article III injury.[6]

---

[6] In fairness to the Agencies, none of the analysis that follows was squarely presented to the Court by Colorado.  Colorado's diversion-of-resources argument comprises: (i) one ambiguous sentence in its opening brief (ECF No. 24 at 10 ("[The New Rule] imposes an immediate compliance and enforcement burden on Colorado, which does not currently have dedicated funding or staffing resources to undertake enforcement against illegal fill activities and instead has relied on EPA and Corps oversight.")); (ii) one sentence in a declaration supporting the opening brief (ECF No. 32 ¶ 15 ("The [Water Quality Control] Division does not currently have dedicated funding or staffing resources to undertake this enforcement effort, so will need to pull enforcement resources currently dedicated to other clean water activities.")); and (iii) one sentence in the reply brief (ECF No. 55 at 3 ("Enforcing against illegal fill activity in state waters will require the State to divert resources currently dedicated to other water pollution activities,

The New Rule does not require the states to pick up where the federal government left off.  Strictly speaking, then, nothing about the New Rule compels Colorado to enforce its water quality laws in Disputed Waters.  However, causation is not quite so strict.  Article III requires that "there be a causal connection between the injury and the conduct complained of," meaning that "the injury must be *fairly traceable* to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (emphasis added).  "Fairly traceable" cannot be stretched too far, particularly through actions a plaintiff chooses (but is not legally compelled) to take due to government action: "[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).  The Court nonetheless finds that Colorado's claimed injury is fairly traceable to the New Rule.

First, Colorado's choice to begin enforcing its no-fill law in the event the New Rule takes effect is not arbitrary or disproportionate to the problem.  The Agencies are no longer asserting jurisdiction over Disputed Waters.  As between an environmental free-for-all and a total ban on filling, Colorado's choice to enforce a total ban is reasonable in light of the potential significant environmental damage that might flow from a choice *not* to enforce its own applicable statute.  (*See* ECF No. 24 at 10–11.)

---

threatening compliance and enforcement across clean water programs.")).  Colorado does not support these assertions with case law, and seems unaware of the various issues that a diversion-of-resources argument entails.  But because the argument revolves around legal principles rather than factual development, it appears to be one of those arguments that the Tenth Circuit would deem to be "preserve[d] (although barely)," *Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 948 (10th Cir. 2020), meaning it would be error for this Court to disregard it as inadequately developed.

Second, Colorado's fear of environmental damage is not "fear[] of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.  Although the New Rule will not *cause* anyone to violate water quality laws and therefore does not create injury on that account (*see* Part III.A.2, above), Colorado has nonetheless made a sufficient record—uncontested by the Agencies—that "EPA has historically completed between three and five enforcement cases in Colorado per year for 404 permit violations."  (ECF No. 32 ¶ 15.)  In other words, regardless of cause, the record shows that violations of Section 404 consistently happen, requiring enforcement action.  At least some of that enforcement burden (*i.e.*, filling in Disputed Waters) will now fall in Colorado's lap.  That share of the enforcement burden is not at all minimal or speculative.  Colorado asserts, and the Agencies do not dispute, that about half of state waters protected by the Current Rule will be unprotected by the New Rule.  (ECF No. 29 ¶ 13.)

Third, for several decades it has been established that diversion of resources is a cognizable harm in the context of Article III standing analysis.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Although cases upholding diversion of resources as a cognizable harm are almost always about nonprofit organizations seeking to advance a social goal (mostly fair housing, voting rights, and immigrant rights),[7] the Court is not aware of any case couching the diversion-of-resources injury

---

[7] *See, e.g.*, *id.* (fair housing organization "devote[d] significant resources to identify and counteract [the defendants'] racially discriminatory steering practices" (internal quotation marks omitted)); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ("enforcement [of day-laborer solicitation ordinance] will require [the plaintiff] to divert resources from other of its [pro-immigrant] activities to combat the effects of the Ordinance"); *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (challenged law forced voting rights organization to "spend extra time and money educating its members about these Texas provisions and how to avoid their negative effects"); *see also* 13A Charles

as something unique to nonprofit organizations, or that is otherwise a "special relaxation" of standing.  *Zeppelin v. Fed. Highway Admin.*, 305 F. Supp. 3d 1189, 1198 (D. Colo. 2018).

Fourth, diversion of resources creates economic harm that—in a case against a private litigant—could be recovered through compensatory damages.  *See Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  However, as discussed in Part III.A.3, above, Colorado cannot recover its economic losses against the Agencies, even if it succeeds on the merits of this lawsuit, because the APA does not waive sovereign immunity to money damages.

For these reasons, the Court finds that Colorado is poised to suffer an injury in fact that is fairly traceable to the New Rule, and would be redressed by a favorable ruling in this case.  Moreover, that injury is certainly impending and would be irreparable.  Accordingly, Article III standing and the irreparable harm requirement of the preliminary injunction test are both satisfied.

**B.      Likelihood of Success on the Merits**

The Court now turns to whether Colorado is likely to succeed in proving at least one of its theories that the Agencies unlawfully promulgated the New Rule.

1.      Legal Standards

Although this case centers around interpretation of the CWA, Colorado's right to sue arises under the APA.  The APA empowers a reviewing court to "set aside" agency action if it is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Generally, an agency

Alan Wright et al., *Federal Practice & Procedure* § 3531.9.5 nn.15–18 (3d ed., Apr. 2020 update).

decision will be considered arbitrary and capricious

> if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A reviewing court should engage in a "thorough, probing, in-depth review,"

*Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted), with

its review of the merits "generally limited to . . . the administrative record," *Custer Cnty.*

*Action Assoc. v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001). However, "[t]he

scope of review under the 'arbitrary and capricious' standard is narrow and a court is

not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463

U.S. at 43.

2.    The Supreme Court's *Rapanos* Decision

The history of litigation over "waters of the United States" is long and

complicated. For present purposes, the overridingly relevant decision is *Rapanos v.*

*United States*, 547 U.S. 715 (2006). The Court finds the Third Circuit's summary of

*Rapanos*—and the problems it has created—to be helpful for present purposes:

> In *Rapanos*, a consolidation of two cases, the Court
> considered "whether four Michigan wetlands, which lie near
> ditches or man-made drains that eventually empty into
> traditional navigable waters, constitute 'waters of the United
> States' within the meaning of the Act." *Id.* at 729 (plurality
> opinion). The Court of Appeals for the Sixth Circuit had
> upheld the Corps' claim of jurisdiction. The Supreme Court,
> in a fractured 4-1-4 decision, vacated those judgments and
> remanded for further proceedings to determine whether the
> wetlands were subject to the restrictions of the CWA.
>
> Four dissenting Justices took an expansive view of the

CWA's reach.  Justice Stevens, writing for the dissenting Justices, stated that the Court should have deferred to what he and his fellow dissenting Justices viewed as the Corps' reasonable interpretation of its jurisdiction.  *Id.* at 796 (Stevens, J., dissenting).  However, five Justices believed that the Corps' jurisdiction is more limited, although they did not all agree on the proper test to determine the scope of that jurisdiction.

Justice Scalia, writing for a four-Justice plurality, stated that the term "waters of the United States" as used in the CWA "includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams [,] . . . oceans, rivers, [and] lakes.'"  *Id.* at 739 (alterations in original) (citing Webster's New International Dictionary 2882 (2d ed. 1954)).  The plurality opinion noted that "the phrase ['the waters of the United States'] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."  *Id.* As for wetlands, the Justices in the plurality concluded that they only fall within the scope of the CWA if they have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands."  *Id.* at 742.

Justice Kennedy concurred.  Although agreeing with the plurality's conclusion that the Corps' jurisdiction was more limited than the dissenters believed and that the case should be remanded, Justice Kennedy disagreed with the plurality's jurisdictional test.  Under Justice Kennedy's approach, wetlands are subject to the strictures of the CWA if they possess a "significant nexus" with "waters of the United States," meaning that the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id.* at 779, 780 (Kennedy, J., concurring).

At first glance, the *Rapanos* opinions seem to present an analytical problem: the three opinions articulate three different views as to how courts should determine whether wetlands are subject to the CWA, and no opinion was joined by a majority of the Justices.  So which test should apply? Interestingly, after explaining why he would have affirmed the judgments below, Justice Stevens noted that, "[i]t has been [the Supreme Court's] practice in a case coming to us

> from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate." *Id.* at 810 (Stevens, J., dissenting). That practice, he observed "has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views." *Id.* (citations omitted). Then, Justice Stevens stated that, although the Justices voting to remand disagreed about the appropriate test to be applied, the four dissenting Justices—with their broader view of the CWA's scope—would nonetheless support a finding of jurisdiction under either the plurality's or Justice Kennedy's test, and that therefore the Corps' jurisdiction should be upheld in all cases in which either test is satisfied. *Id.* at 810 & n.14.

*United States v. Donovan*, 661 F.3d 174, 179–80 (3d Cir. 2011) (parallel citations omitted).

In the immediate wake of *Rapanos*, the Agencies did not amend the definition of "waters of the United States" in 33 C.F.R. § 328.3, so federal courts (such as the Third Circuit in *Donovan*) were forced to grapple with what sort of gloss, if any, *Rapanos* imposed on that definition. Some courts, like the Third Circuit, concluded based on Justice Stevens's closing remarks that "the CWA is applicable to wetlands that meet either the test laid out by the plurality or by Justice Kennedy in *Rapanos*." *Donovan*, 661 F.3d at 184. Other courts, like the Seventh Circuit, have concluded that Justice Kennedy's "significant nexus" test controls. *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006).

3. Colorado's Previous Suit to Prevent Federal "Overreach"

In 2015, the Agencies amended 33 C.F.R. § 328.3, purporting to codify Justice Kennedy's "significant nexus" test. *See* 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Several states—including Colorado—successfully sued to enjoin the 2015 Rule. *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015). Specifically, they convinced the district court that the 2015 Rule's interpretation of "significant nexus" likely "violate[d]

the congressional grant of authority to the EPA" because it swept more broadly than Justice Kennedy would have allowed. *Id.* at 1056. In the *North Dakota* case, Colorado very much cared to ensure that the Agencies did not overstep their jurisdiction, regardless of the environmental benefits of broader regulation. (*See North Dakota et al. v. EPA et al.*, No. 3:15-cv-59 (D.N.D.), ECF No. 212 at 39 (filed June 1, 2018) ("Any implication that waters and lands falling outside federal CWA jurisdiction are somehow 'unregulated' and thus 'unprotected' must be rejected: what is at issue here are the limits of federal jurisdiction, not environmental protection. . . . Instead of Plaintiff States regulating the land and water within their borders to advance their own sovereign responsibilities to protect their resources and citizens, the [2015] Rule would have them defer to the federal government's vast regulatory overreach.").)

### 4. The New Rule

Not long after taking office, President Trump directed the Agencies to rescind or revise the 2015 Rule, and to "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." 82 Fed. Reg. 12497, 12497 (Feb. 28, 2017). In October 2019, after two district courts had invalidated the 2015 Rule following full merits briefing,[8] the Agencies repealed the 2015 Rule and reinstated the rule in effect at the time of *Rapanos*, *i.e.*, what this Court has called the "Current Rule." 84 Fed. Reg. 56626 (Oct. 22, 2019). Challengers promptly sued, arguing that the Current Rule violates the CWA by protecting too little, *Murray et al. v. Wheeler et al.*, No. 19-cv-1498 (N.D.N.Y., filed Dec. 4, 2019), and too much*, see, e.g.*, *N.M. Cattle Growers' Ass'n v. EPA et al.*, No.

---

[8] *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497 (S.D. Tex. 2019).

19-cv-988 (D.N.M., filed Oct. 22, 2019).

In April 2020, the Agencies published the New Rule (formally, "The Navigable Waters Protection Rule"), to take effect June 22, 2020.  85 Fed. Reg. 22250 (Apr. 21, 2020).  It makes numerous changes to the Current Rule, which the Court need not describe in detail.  For present purposes, the Court notes that one of the explicit purposes of the New Rule is to establish "categorically jurisdictional and categorically excluded waters."  *Id.* at 22270.  Among the categorical exclusions are "[e]phemeral features, including ephemeral streams, swales, gullies, rills, and pools."  *Id.* at 22340.

5.   Colorado's Current Challenge

Since the *North Dakota* case, Colorado has had a change of Attorney General administrations, and federal "overreach" is apparently now no longer such a great concern.  Colorado now wants to force the federal government to remain in the role carved out for it in the Current Rule.  Colorado's lead argument in this regard is that the New Rule is contrary to the CWA's purpose and legislative history because the New Rule—surprisingly—"conflicts with Congress' intent to create *a federal-state partnership* in which both the Agencies and the states would *work together* to protect the broadly defined 'waters of the United States.'"  (ECF No. 24 at 13 (emphasis added).)

The Court frankly does not understand what sort of "federal-state partnership" Colorado envisions in the dredge-and-fill sphere.  Colorado's unusual legislative policy is that dredge and fill is forbidden—without exception.  But, as a practical matter, Colorado overlooks this policy and relies on a federal permit loophole, *see* Colo. Rev. Stat. § 25-8-501(1), because some wetlands are worth filling in pursuit of money or, more nobly, safety.  In other words, Colorado "delegates" to the federal government the decision whether to issue a permit to do something that Colorado otherwise would not

allow, and Colorado reaps the benefits, at the expense of legislative policy.  Colorado

therefore has an unusual view of "work[ing] together to protect the broadly defined

'waters of the United States.'"  (ECF No. 24 at 13.)  *See also Rapanos*, 547 U.S. at 798

n.6 (2006) (Stevens, J., dissenting) ("Indeed, the Corps approves virtually all section

404 permits, though often requiring applicants to avoid or mitigate impacts to wetlands

and other waters." (internal quotation marks omitted; alterations incorporated)).

       As it turns out, however, the Court need not decide whether Colorado's (current)

view about the purpose and history of the CWA wins the day.  One of Colorado's

alternate arguments has much more obvious merit, namely, that *Rapanos* already

forecloses the approach taken in the New Rule.

       It is notoriously difficult to understand what *Rapanos* is *for*, *see, e.g.*, *United

States v. Johnson*, 467 F.3d 56, 60–66 (1st Cir. 2006), but it is much simpler to

understand what *Rapanos* is *against*.  Specifically, five justices rejected the Scalia

plurality's categorical exclusion of "channels containing merely intermittent or ephemeral

flow."  547 U.S. at 733–34 (plurality op.); *compare id.* at 768–70 (Kennedy, J.,

concurring in judgment) (finding the plurality's approach to "intermittent and ephemeral

streams" to be "without support in the language and purposes of the [CWA]"); *id.* at

800–04 (Stevens, J., dissenting [joined by Souter, Ginsburg, and Breyer]) (rejecting

plurality's categorical exclusion of intermittent or ephemeral stream beds).  And more

generally, five justices found the plurality opinion to be "inconsistent with the [CWA's]

text, structure, and purpose."  *Id.* at 776 (Kennedy, J., concurring in judgment); *see also

id.* at 800 (Stevens, J., dissenting) ("[the plurality's] creative opinion is utterly

unpersuasive").  The New Rule, however, is self-consciously intended to take the

plurality opinion (including its categorical exclusion of ephemeral watercourses), flesh out the details, and make it the new law of the land.  *See* 85 Fed. Reg. at 22259–325. *Rapanos* forecloses this interpretation of the CWA.  *See Vasquez v. Hillery*, 474 U.S. 254, 262 n.4 (1986) (agreement of five justices, even when not joining each other's opinions, "carr[ies] the force of law").[9]

The Agencies emphasize Justice Kennedy's statement in *Rapanos* that, "[a]bsent more specific regulations, the Corps must establish a significant nexus on a case-by-case basis when seeking to regulate wetlands based on adjacency to nonnavigable tributaries, in order to avoid unreasonable applications of the [CWA]."  547 U.S. at 782. The Agencies apparently view the New Rule as providing the called-for "more specific regulations."  (ECF No. 51 at 15.)  Whether or not the New Rule is more specific than the Current Rule, or helps to avoid unreasonable applications of the CWA, Justice Kennedy and the dissenters already rejected the specific approach the Agencies adopted here.

The Agencies also emphasize *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005) ("*Brand X*").  There, the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction . . . only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982.  The Agencies argue that *Rapanos* was not this kind of prior court decision, so the Agencies were free to reinterpret "waters of the United States."  (ECF No. 51 at

---

[9] *State of California* views the reasoning here as a "suspect attempt to cobble together a holding from the [*Rapanos*] concurrence and the dissent."  (ECF No. 60-1 at 11.)  That decision appears unaware of *Vasquez v. Hillery*.

14–15.)  The Court agrees with the premise, but, under the circumstances, the conclusion does not follow.

Again, it is difficult to discern what *Rapanos* was *for*—no judicial construction of the CWA offered in that case had the support of five justices.  So the Agencies are correct that *Rapanos* did not "hold[] that its construction [of the CWA] follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982.  However, *Rapanos* is unambiguously *against* the construction offered in the plurality opinion, on which the New Rule is modeled.[10]  So, although nothing in *Rapanos* forecloses reinterpretation of "waters of the United States," that decision *does* foreclose the reinterpretation at issue here.[11]

For at least these reasons, Colorado is likely to succeed in proving at least that the New Rule is "not in accordance with law."  5 U.S.C. § 706(2)(A).

## C.   Balance of Harms & Public Interest

In analyzing whether a preliminary injunction should issue against the government, the final two elements of the preliminary injunction test are treated

---

[10] For this reason, the Court disagrees with *State of California*'s reasoning that *Brand X* leaves open the interpretation adopted in the New Rule.  (*See* ECF No. 60-1 at 11.)  *Brand X* was about affirmative statements of how a statute *must* be interpreted, not about *foreclosed* interpretations (when other interpretations might be available).

[11] The problem for the Agencies, unfortunately, is that *Rapanos* arguably forecloses *every* formulation of "waters of the United States" proposed in *Rapanos*, or proposed by the Agencies thus far.  For example, eight justices rejected Justice Kennedy's case-by-case "significant nexus" approach.  *See Rapanos*, 547 U.S. at 753–57 (plurality op.) (arguing that Justice Kennedy's approach has no basis in the CWA); *id.* at 797–98, 807–09 (Stevens, J., dissenting) (arguing that case-by-case determination is foreclosed by earlier Supreme Court decisions and that Justice Kennedy's approach is therefore both incorrect and unnecessarily inefficient).  And the plurality and Justice Kennedy (totaling five justices) rejected the categorically broad approach espoused by the dissenters and the Agencies.  *See id.* at 746–53 (plurality op.); *id.* at 778–82 (Kennedy, J., concurring in judgment).  In short, the Agencies will get sued—such as by Colorado, twice now—regardless of what they try.  (*See* Part III.B.3, above.)  But that is a problem for the Supreme Court to resolve.  For present purposes, it remains unavoidable that five justices in *Rapanos* rejected the Agencies' current approach.

together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Colorado argues, "When a case is brought under an environmental statute, the courts place extraordinary weight on a general concern for the public interest."  (ECF No. 24 at 23 (citing *Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1171 (D. Wyo. 1998)).)  Colorado forgets that it wants this injunction, at least in part, so development can continue at the expense of the environment.  Nonetheless, the Court agrees that the public interest would be better served by not allowing the New Rule to take effect at this time.  If the Court were to decide otherwise, but then ultimately invalidate the New Rule (as appears probable on this record), it would likely create unnecessary confusion among the regulated community about what standard really applies.  The Court finds it in the public interest, therefore, to maintain the *status quo*—what the regulated community is already accustomed to—pending resolution on the merits.  *Cf. RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) ("the primary goal of a preliminary injunction is to preserve the pre-trial status quo").

The Agencies argue that any injunction must "address[] *only* the *specific* regulatory provisions purportedly creating imminent, irreparable harm."  (ECF No. 51 at 30 (emphasis in original).)  It appears, however, that the entire approach of the New Rule is contrary to *Rapanos*.  Regardless, the Court finds it against the public interest to attempt to create a hybrid Current-New Rule, which would likely be even more confusing and unworkable than allowing the New Rule to take effect and later invalidating it.  Rather, the Court will enjoin the Agencies to continue administering Section 404 in Colorado under the Current Rule.[12]

---

[12] Colorado does not seek a nationwide injunction (*see* ECF No. 55 at 12), presumably because Colorado is downstream of no other state, so it is difficult for Colorado to argue that

### IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Colorado's Amended Motion for Preliminary Injunction (ECF No. 24), construed

as a motion for stay of agency action under 5 U.S.C. § 705, is GRANTED;

2.    The effective date of the Navigable Waters Protection Rule, 85 Fed. Reg. 22250

(Apr. 21, 2020) is STAYED within the District of Colorado; and

3.    The Agencies (along with their officers, agents, servants, employees, attorneys,

and all others who are in active concert or participation with any of them) are

hereby PRELIMINARILY ENJOINED to continue administering Section 404 in

Colorado under the provisions of 33 C.F.R. § 328.3 as it is presently codified.

Dated at Denver, Colorado this 19th day of June, 2020.

BY THE COURT:

William J. Martinez
United States District Judge

---

implementation of the New Rule elsewhere affects Colorado.